Filed 1/26/22  P. v. Blessett CA3
Review denied 5/25/22; reposted with Supreme Court order and statement

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANTOINE LAMAR BLESSETT,<br><br>　　　　Defendant and Appellant. | C074267<br><br>(Super. Ct. No. 12F01121)<br><br><br>OPINION ON TRANSFER |

After an argument precipitated by references to their respective gangs, the victim Christopher Sisoukchaleun, took off his shirt to fight defendant Antoine Lamar Blessett. Instead, defendant followed Sisoukchaleun into the street and shot him between the eyes at nearly point-blank range with a firearm he had retrieved only moments earlier from his pickup truck, which was parked nearby.  Defendant then fired a second close-range shot, striking Sisoukchaleun in the torso.

1

A jury found defendant guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found true enhancement allegations that defendant personally used a firearm and proximately caused death or great bodily injury (§ 12022.53, subd. (d)), that he personally used a firearm in the commission of a felony (§§ 12022.5, subd. (a), 12022.53, subd. (b)), and that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Defendant appealed claiming numerous trial errors and that the 10-year sentence imposed pursuant to section 186.22 must be struck. Additionally, we granted defendant's request for supplemental briefing on the impact of Senate Bill No. 620 and whether the matter must be remanded for the trial court to consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements.

We originally concluded that defendant's confrontation clause violation contentions under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) were forfeited because trial counsel failed to make a specific objection in the trial court concerning the confrontation clause violation theories he advanced on appeal regarding the gang expert testimony. The California Supreme Court granted review and deferred action pending its decision in *People v. Perez* (2020) 9 Cal.5th 1 (*Perez*) . Thereafter, our high court in *Perez* held that a defendant's failure to object, pre-*Sanchez*, to the admission of case-specific testimonial hearsay does not forfeit a claim based on *Sanchez.* (*Id*. at pp. 4, 9.) And our high court in *Perez* disapproved of our original opinion on this basis. (*Id*. at p. 14.)

Our high court further deferred action in this case pending disposition in *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*). *Valencia* addressed the manner in which the

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

prosecution must prove the existence of predicate offenses (§ 186.22, subd. (e)) for purposes of proving "a pattern of criminal gang activity" (§ 186.22, subd. (f)) in cases involving allegations of active gang participation (§ 186.22, subd. (a)) or gang enhancement allegations (§ 186.22, subd. (b)). In our original opinion, we concluded that predicate offenses not involving the defendant on trial were background facts, not case-specific facts as the court in *Sanchez* had defined such facts. Therefore a gang expert was permitted to testify about such matters, even if that testimony was based on hearsay sources. In *Valencia*, our high court, after clarifying what it meant by background facts and case-specific facts, held that the commission of predicate offenses must be proven by independently admissible evidence and that, under *Sanchez*, "such proof may not be established solely by the testimony of an expert who has no personal knowledge of facts otherwise necessary to satisfy the prosecution's burden." (*Valencia*, at p. 826.) *Valencia* disapproved of our original opinion on this issue. (*Id.* at p. 839, fn. 17.)

Our high court transferred the matter back to us and directed that we vacate our original decision and reconsider the cause in light of *Perez* and *Valencia*. Both parties have briefed both issues.

In light of *Perez*, we conclude defendant did not forfeit his contentions under *Crawford* and *Sanchez*. We conclude the admission of the inadmissible evidence was harmless beyond a reasonable doubt as to the charged offenses and firearm enhancement allegations. However, because the gang expert did not have personal knowledge of the facts underlying the predicate offenses about which he testified, this testimony was improperly admitted under *Valencia*. Further, while the charged offenses may supply one of the minimum of two predicate offenses, the remaining evidence was not sufficient to prove a second predicate offense, and therefore the admission of the expert's case-specific hearsay testimony on this subject was not harmless beyond a reasonable doubt as to the gang enhancement. Accordingly, we shall reverse the true finding on the gang enhancement allegation.

3

Defendant's other claims of trial error are forfeited, without merit, nonprejudicial, or have been rendered moot. On remand, the People may elect whether to retry defendant on the gang enhancement allegation.[2] In any event, the trial court shall consider whether to strike the firearm enhancements pursuant to the authorization to do so provided by Senate Bill No. 620 in furtherance of justice under section 1385, subdivision (a). In the event the trial court declines to exercise that discretion, the court shall impose sentences on the section 12022.5 and 12022.53, subdivision (b) enhancements and then stay execution of those sentences pursuant to section 12022.53, subdivision (f).

## FACTUAL AND PROCEDURAL BACKGROUND

### The Prosecution's Case

#### The Shooting and Investigation

On the night of February 8, 2012, Weena Vue travelled to Sacramento from the Merced area with four girlfriends to hang out. They went to Casino Royale to eat. There they met the victim Christopher Sisoukchaleun (also known as Bud), Jack Thammavongsa, Sunny Manivong, Roger Bouriboune, Udom Ketphanh, and an individual named Lou. After leaving Casino Royale, the group drove in several cars to the Sunland Liquor store (Sunland), the location where the murder later occurred. Thammavongsa (Sisoukchaleun's cousin) drove Sisoukchaleun's car because Sisoukchaleun was drunk. The group arrived at Sunland at approximately 1:55 a.m.

As they started walking from their parked car toward Sunland, Sisoukchaleun or Thammavongsa made a hand gesture. Manivong testified that Sisoukchaleun was "not

---

[2] While the People may have the option to retry defendant on the gang enhancement allegation, we would note that doing so would have little practical consequence. Under the circumstances of this case, defendant's conviction is not subject to the 10-year enhancement under subdivision (b)(1)(C) of section 186.22. (*People v. Elizalde* (2015) 61 Cal.4th 523, 539, fn. 10; *People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)

throwing up no gang sign." Thammavongsa testified that Sisoukchaleun was "[t]hrowing up a peace sign" to the girls that pulled up in the other car. Manivong, who also made hand gestures, testified that he did not throw up gang signs, but was simply pointing at Sisoukchaleun and Thammavongsa.[3]

As they walked up to Sunland, Thammavongsa and Sisoukchaleun both used the word "cuz" in their conversation, and Thammavongsa said something about wanting to race. According to Vue, an African-American male, 5'6" or 5'7" tall with closely cropped hair and wearing a black leather jacket and blue jeans with a design of wings or flames on them, who was standing near the door to Sunland, responded, " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' "[4] Vue also testified that the man said, " 'I am a Blood.' " According to Thammavongsa, after he said, " 'Cuz, get some drink,' " the man standing near Sunland, whom he identified as defendant, said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' " Vue testified that Sisoukchaleun responded, " 'Yeah, this is LAC, Little Asian Crip.' "[5] Thammavongsa acknowledged that such an exchange would amount to "[f]ighting words" because Bloods and Crips do not get along. According to Vue, while the conversation had not been aggressive at its inception, at this time, the African-American man "got into [Sisoukchaleun]'s face." According to

---

[3] Manivong testified that he was not a gang member, and he did not "represent nothing."

[4] At trial, Vue did not identify the African-American male she observed on the night of the shooting. However, according to a former Sacramento Police Department sergeant, on February 15 or 16, 2012, Vue identified defendant in a photo lineup as the shooter.

[5] Only Vue used the term " 'Little Asian Crip.' " Thammavongsa testified that both he and Sisoukchaleun were "affiliated" with LGC, or Lao Gangster Crips. Neither Thammavongsa nor Manivong said they recalled hearing anyone say "LGC" or "Little Gangster Crip." However, Thammavongsa testified that a possible response if defendant said, " 'Meadowview Blood' " would be to say, " 'No, this is LGC.' "

Thammavongsa, Sisoukchaleun "got tired of hearing" defendant say " 'Blood, Meadowview.' " Vue became scared and went to her girlfriend's car.

According to Manivong, defendant walked to a white pickup truck parked nearby, opened a tool box, grabbed something, and put it in his back pocket. Sisoukchaleun removed his shirt and it appeared that he and defendant would fight. Sisoukchaleun and defendant walked into the street. Thammavongsa followed. The other guys in their group were "[r]ight there with us" according to Thammavongsa. Thammavongsa acknowledged that he would have intervened if Sisoukchaleun was getting beaten up.

According to Thammavongsa, Sisoukchaleun was saying, " 'Let's fight,' " but defendant "didn't really say nothing" and was not squaring up to fight. Sisoukchaleun took a swing at defendant, but defendant dodged the blow. Defendant pulled out a gun. Manivong heard a woman say, " 'He's got a gun.' " Defendant then shot Sisoukchaleun in the face. Manivong, Thammavongsa, and Sisoukchaleun started running. Defendant fired a second shot and Sisoukchaleun fell, gasping for air, and then Manivong heard two more shots. Someone called 911. Defendant got into the passenger side of the pickup and was driven away by a woman. Manivong provided the pickup's license plate number to the police when they arrived approximately five minutes later.

Thammavongsa and Manivong both testified that no one in their group had any weapons that night. Vue never observed Sisoukchaleun or any of the other guys in their group with any weapons. Manivong informed the police that the gun that was used was a .38-caliber revolver.

The parties stipulated that a video recording of the scene in the vicinity of the shooting recorded by a surveillance camera owned by the City of Sacramento accurately depicted that location on February 9, 2012, and the recording was introduced into evidence. We have reviewed the video. There is no sound, and the actual shooting takes place out of the camera view, but events before and after the shooting can be seen on the recording.

In the events as shown on the video recording, defendant was standing outside of Sunland when Thammavongsa and Sisoukchaleun, identified at trial on the video by Thammavongsa, arrived and approached the store. Manivong, who identified himself in the video, and Ketphanh approached from the other direction. Both Sisoukchaleun and Manivong made hand gestures. As the group approached, defendant emerged from Sunland's recessed entry and stood on the sidewalk in front of the store. Defendant was briefly among Thammavongsa, Manivong, and an unidentified individual in front of the recessed entry. Thammavongsa walked around defendant's left and almost bumped into defendant as he passed. Defendant turned to his left behind Thammavongsa. As he did so, Thammavongsa raised his right arm up for a brief moment.

It appears that defendant spoke with members of the group.[6] Defendant, Thammavongsa, Sisoukchaleun, Manivong, Vue, and others all crowded in the recessed store entry. Vue began to walk away from the storefront just as a white pickup truck driven by a woman parked in front of Sunland. Defendant turned away from the group and walked to the white pickup, where it is undisputed he retrieved a handgun from a toolbox in the truck bed. The woman got out of the truck and walked around the back of the truck toward defendant who was on the passenger side. She and defendant then approached the store. The woman walked into the recessed entry where Sisoukchaleun's group was located while defendant stayed back on the sidewalk gesticulating with his arms, bobbing his head toward the entryway, and appearing to speak angrily to the people therein. Sisoukchaleun, identified at this point in the video by Manivong and

---

[6] When viewing the surveillance video during her testimony, Vue initially pointed to a different unidentified African-American individual as being the person who spoke with Sisoukchaleun and who subsequently walked over to the white pickup truck. Defendant's trial counsel argued in closing that it was not clear defendant was the individual who spoke with Sisoukchaleun. Nonetheless, ultimately, at trial and on appeal, defendant does not dispute he was the individual who interacted with, and ultimately shot and killed, Sisoukchaleun.

Thammavongsa, removed his outer shirt and handed it to an unidentified individual. As defendant and Sisoukchaleun appeared to confront each other, Sisoukchaleun walked off of the sidewalk, into the street, and out of camera view while defendant can still be seen on the periphery of the frame. An unidentified African-American male walked from the recessed entry and approached defendant with his arm extended. He then placed his arm over defendant's chest, appearing to speak to him and hold him back from the confrontation. At this time, Thammavongsa and Manivong gathered near defendant. Defendant appeared to speak somewhat animatedly with the unidentified African-American male, pointing his finger at that person's chest. Thammavongsa and Manivong looked on. Defendant then walked around the unidentified African-American male, off of the sidewalk in the direction Sisoukchaleun had walked, and out of the frame. In the meantime, the woman who had parked the truck came out of the recessed area, walked behind the group, and followed defendant out of the frame. Thammavongsa followed defendant out of the frame. A moment later, the unidentified individual who took Sisoukchaleun's shirt can be seen ducking suddenly and retreating behind the white pickup truck. Most of the individuals in the vicinity then scattered. Sisoukchaleun himself can briefly be seen running away. The woman who drove the pickup truck then walked back into the store entryway, received a package or bag, ran to the driver's door of the pickup, and got in. Defendant got in the passenger side of the pickup and left the scene, driven by the woman.

Officer Paul Fong, who arrived shortly after 2:00 a.m., was the first officer on the scene. Manivong relayed to Fong the license plate number of the pickup, and Fong broadcast that information immediately.

Later in the morning, Officer Konrad Von Schoech stopped a Kia in which defendant was a passenger. Von Schoech transported defendant to the police station. There, Detective Thomas Shrum intended to swab defendant's hands for gunshot residue. However, after his arrest, defendant asked to use the restroom. He was accompanied by

8

Detective Shrum. As defendant was walking to the sink after urinating, Detective Shrum told defendant not to wash his hands. Defendant put his hands on the soap dispenser, looked at Shrum, soaped up his hands, and washed them anyway. Thereafter, Detective Shrum interviewed defendant briefly. During the interview, defendant claimed someone had stolen his truck.

Detective Bryan Alonso participated in a search of the Kia the following day. Alonso discovered a set of license plates under blankets in the rear of the vehicle. Additionally, a bag in the Kia contained a rolled-up pair of jeans with a red design.

Alonso also participated in a search at a residence. In the backyard, police discovered a white F-150 pickup truck without license plates. The vehicle identification number of the truck corresponded to the license plates discovered earlier inside the Kia. In the truck, police found an empty prescription bottle bearing defendant's name and address.

Alonso participated in a search at defendant's apartment. Police discovered items bearing defendant's name. Additionally, police discovered a suitcase in the living room containing .380-caliber auto and nine-millimeter ammunition. Behind a television in the bedroom, police discovered a .40-caliber magazine and a black holster. Police also discovered a box of Remington .357-caliber ammunition containing 10 rounds and a box of Remington .38-caliber ammunition containing 33 rounds.

According to the forensic pathologist who conducted the autopsy on Sisoukchaleun, he sustained one gunshot wound "pretty much on the bridge of the nose, near the center of his face," and another on the left side of his torso. Sisoukchaleun died as a result of these gunshot wounds. The muzzle of the gun was approximately six inches away when it fired the shot that struck Sisoukchaleun in the face. The muzzle was approximately eight to ten inches away, possibly as little as six inches, when the bullet was fired that struck Sisoukchaleun in the torso. The bullet recovered from

9

Sisoukchaleun's torso was a .38-caliber round. Sisoukchaleun's blood alcohol level was 0.28 percent.

**Recorded Phone Calls from the Jail**

Excerpts of recorded phone calls defendant made from the county jail were played for the jury. In a phone conversation later in the day after his arrest with someone he referred to as "Momma," defendant responded to a question about whether he committed the murder by repeating the claim that someone stole his truck. He said, "Somebody stole my damn truck man and they went and did a crime man. Momma, now it - it just looks like I'm guilty."

In a phone conversation a day later with someone defendant identified as Grandma, he again said somebody had used his truck to commit a crime. When asked what kind of crime, defendant replied, "I think murder." He said he did not report his truck stolen because he had been drinking that night.

In a second call that day, defendant spoke with a male. The conversation begins after the male accepted the collect call from defendant.

"Male: What's up *cuz*? What's happening with it?

"Defendant: Man, it's looking all bad for the home team *blood*.

"Male: *Blood*, come on now.

"Defendant: Yep. It's real bad.

"Male: I'm hella mad b- I'm hella mad at you *blood*. I'm hella mad but, uh.

"Defendant: [¶] . . . [¶] . . . I don't even know what to do, man. I don't even know what to do. Right now it's just hush mode and wait until they say something to me, you dig what I'm saying?

"Male: Well, that's what you do then, *blood*. . . .

"Defendant: [¶] . . . [¶] . . . I mean somebody stole my shit man. And I [¶] . . . [¶] I was too drunk to even call the police. I was too drunk, nigga. I had drunk two fifths to myself man." (Italics added.)

10

The following day, defendant had a phone conversation with a woman, during which she informed him that she had heard on the news that there was video of the shooting. Defendant's response was: "Are you serious?" He asked if his picture was on the video and then said again somebody had stolen his truck. He said he was too drunk to report it to the police and then said, "Shit. That's my story and I'm sticking with it." In discussing people with whom he was housed at the jail, defendant said, "They had a Crip in here. Long as that nigga don't say nothing crazy to me. [¶] . . . [¶] Yeah and they forget. They remember when a mother fucker shot me in my back. That's why I can't be associated with no Crip. Because they - they remember when they - I got shot in my back. [¶] . . . [¶] . . . But when they shot me in my back, I was a youngster but I went to jail too. [¶] . . . [¶] Because I was in sort of a gang shooting."

Defendant did not claim that he shot Sisoukchaleun out of fear for his safety or in self-defense during any of the recorded phone conversations.

**Gang Expert Testimony**

Detective Justin Saario testified as an expert in African-American criminal street gangs. According to Saario, respect is the ultimate driving force in gang culture. However, respect to gang members is not the same as respect as understood by members of society at large. In gang culture, respect is forced by instilling fear in rival gang members and in the community. For gang members, respect and fear are roughly synonymous. If a gang member is disrespected, there is an expectation that the situation "is dealt with," because disrespect shown to the gang member reflects poorly both on the gang member and the gang itself. In the absence of a response to a showing of disrespect, the individual and the gang will be perceived as weak.

Saario testified that Meadowview Bloods are a subset of the Bloods criminal street gang. They identify with the color red. Crip gangs, rivals to the Bloods, identify with the color blue. Crips use the term "cuz" in referring to one another, whereas Bloods use the term "Blood."

11

LGC, or Lao Gangster Crip, is a North Sacramento Asian gang. Saario testified that Asian gangs emulate or "copycat" African-American gangs.

According to Saario, the primary activities of the Meadowview Bloods are robbery, burglary, narcotic sales, weapons possession, and assaults with deadly weapons, which have led to murders. As we shall discuss further *post*, Saario testified about predicate offenses involving three Meadowview Blood gang members, occurring on one occasion. None of these individuals were involved in defendant's trial. Saario testified that these individuals beat a Crip gang member and when the Crip fled, one of the three Bloods attempted to follow the Crip into his house armed with a firearm. The Crip obtained a gun, came out and shot one of the three Bloods. One of the Bloods was convicted of active participation in a criminal street gang, specifically the Meadowview Bloods; another was convicted of active participation in a criminal street gang, specifically the Meadowview Bloods, and felony battery; and the third was convicted of residential burglary, assault with a with force likely to cause great bodily injury, and being a felon in possession of a firearm and ammunition. Certified court records of these convictions were admitted into evidence.

Saario testified about a series of prior crimes and contacts defendant previously had with law enforcement that aided in Saario's opinion about defendant's gang affiliation. This testimony is the primary subject of defendant's confrontation clause claim.

In November 1991, defendant was walking in South Sacramento when a vehicle occupied by several African-American males drove by. One of the individuals shot at defendant, striking him in the back. At the time, defendant was wearing a red 49ers jacket and a red 49ers hat. Defendant initially denied being a gang member, but then acknowledged that "sometimes people think that he is with the Meadowview Bloods." According to defendant's friend or cousin, defendant was shot by a member of the Oak

12

Park Bloods because of a rivalry that existed between the Meadowview Bloods and the Oak Park Bloods.

In December 1992, police officers went to an address in response to a narcotics complaint. They discovered that there were several people at that location who were on searchable probation. Police came into contact with defendant, who was the subject of a felony warrant at the time. Police searched the residence and discovered 10 pieces of rock cocaine in a bedroom associated with a Mr. Wormley. As police were leaving the residence with defendant, Wormley entered the apartment. In his pocket, police discovered a "photograph of a male black individual and on the back of that photograph, it said, 'AY.B. from the M.V.B., bka des.' " Saario stated that M.V.B. stood for Meadowview Bloods. Defendant later confessed that, as police approached the apartment, he hid the rock cocaine in Wormley's bedroom.

On June 2, 1993, police stopped a vehicle occupied by defendant and the driver, Oscar Daniels, a "Blood associate." In the vehicle, police discovered a .22-caliber semiautomatic handgun in the driver's door.

On October 26, 1993, a police officer observed defendant riding a bicycle. The officer attempted to stop defendant, but defendant dismounted from the bicycle and ran. As the police officer chased defendant, defendant pulled out a rifle which he had concealed in his pants and the officer shot defendant. At the time, defendant was wearing a red bandana. According to Saario, at that time, gang members commonly identified themselves with red or blue bandanas depending upon their affiliation. Defendant was identified in the police system as a Meadowview Blood, and police noted the "Meadowview" tattoo on his left arm.

On January 11, 1995, police contacted defendant in connection with a domestic violence call. Defendant was wearing burgundy pants and was described as a Meadowview Blood.

13

On September 2, 1995, defendant and Daniels, wearing ski masks, drove up to a male who was in a parking lot placing his daughter into his vehicle. Either defendant or Daniels pulled out a gun and demanded the victim's wallet and keys. The victim ran away, and defendant and Daniels drove off. Sheriff's deputies stopped the vehicle defendant was driving. In the vehicle, officers discovered a red ski mask under the driver's seat and another ski mask under the passenger seat. Officers also discovered a .41-caliber Smith and Wesson revolver on the passenger's side of the vehicle. Defendant and Daniels were identified at a showup.

In April 2002, defendant committed gang-related crimes with Lawrence Barnett, a Del Paso Heights Blood.

Saario also relied upon the recorded phone call defendant made from the jail to the woman in which defendant said there was a Crip in custody with him, but that as, " '[l]ong as that nigga don't say nothing crazy,' " defendant did not care. Saario testified that defendant went on to say, " '[t]hey remember when motherfucker shot me in my back. That's why I can't be associated with no Crip, because they remember. They remember when they -- I got shot in my back. '" Saario testified defendant further said, "it was 'because it was sort of a gang shooting.' "

On cross-examination, the defense asked Saario about the phone conversation defendant had with the male the previous day, during which the male initially referred to defendant as " 'cuz.' " Saario stated that, while it was unusual for a Blood to call another Blood "cuz," these rules were not "etched in stone." Saario also noted that, during the conversation, the male speaking to defendant referred to defendant as " 'Blood' " multiple times and defendant also referred to the male as " 'Blood.' "

Saario testified that it is common for gang members to obtain tattoos identifying themselves. Saario personally observed a tattoo on defendant's left arm that said "Meadowview," and testified that this also weighed into his opinion regarding defendant's gang affiliation.

Based on defendant's background, his prior contacts with law enforcement, his Meadowview tattoo, and his statements about the Bloods and Meadowview just prior to shooting Sisoukchaleun, Saario opined that defendant was a member of the Meadowview Bloods.

Saario further opined that, in a hypothetical situation mirroring the facts of this case, the shooter's actions would benefit the Bloods. Saario elaborated: "That benefits the Bloods, based on the fact that the individual, the Blood gang member when being -- it goes to the whole respect and disrespect aspect of a Crip gang member calling out using Crip terminology, and the [B]lood gang member taking offense to that, and challenging the Crip by saying, 'No, this is Bloods.' That puts everybody on notice. Crip gang member and anybody else that is there, that by you doing that, that is disrespectful to me being a Blood gang member. And by me saying, No, it's Bloods. This is Meadowview. I'm announcing that I'm a Blood gang member. And what you're doing is disrespect. [¶] There's two ways that it can go right there. The Crip can, 'Hey, man, sorry. You know, it all cool. Let's just hang out' or take offense to the challenge of him not respecting and challenging him by saying 'It's Blood' thing. And it's that drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods." Saario further testified that "[t]his is Meadowview" puts everyone on notice, "I'm Meadowview. This is what it's about. And basically, that's not gonna be allowed. You can't throw out Crip stuff when I'm a Blood." The reference to Meadowview communicated, "I represent Meadowview. I am Meadowview."

With regard to hypothetical conduct mirroring defendant's actions in retrieving the gun from his truck, Saario testified, "At that point, the individual -- once he puts out, 'I'm a Blood,' you know that that's just gonna -- this is not gonna go anywhere good. And the individuals[] involved in it know that as well. [¶] . . . [T]here's an ultimate sign of power within the gang culture, and that's a firearm. Individuals that are armed are more confident because they know that there's nothing more that anybody can have other than

15

a firearm. There's not bazookas or anything like that around. So if you're armed, you have the ultimate weapon of power or item of power. [¶] So by going and getting that, that weapon, he knows that no matter what happens, there's nothing that I can be outdone with. So if I'm gonna go back and confront this person -- there's a term, it's called, 'caught slipping.' Individuals that are caught slipping are individuals that engage in a confrontation without a weapon. Commonly people will say, I was caught slipping, you know, at a house party. You know, I didn't have a gun on me. I'm a gang member in a certain area. I didn't have my gun on me. I was caught slipping. [¶] So by him having his gun, he's not caught slipping. He knows that no matter what, he's got that -- that back up, being the gun. No matter what happens, he's able to use it."

Saario testified that the hypothetical scenario was a typical gang escalation; "[w]e see it all of the time."

**Defense Case**

Defendant did not testify and the defense presented no witnesses. Trial counsel argued to the jury that defendant acted in self-defense or imperfect self-defense.

**Verdict and Sentencing**

The jury found defendant guilty of murder in the first degree (§§ 187, subd. (a), 189) and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found true all three firearm enhancement allegations (§§ 12022.5, subd. (a), 12022.53, subd. (b), 12022.53, subd. (d)), as well as the gang enhancement allegation (§ 186.22, subd. (b)(1)).

The court sentenced defendant to a term of 85 years to life, calculated as follows: 25 years to life for murder in the first degree, doubled to 50 years to life for a prior strike conviction; a consecutive term of 25 years to life for the personal use of a firearm enhancement pursuant to section 12022.53, subdivision (d); and a consecutive term of 10 years on the gang enhancement (§ 186.22, subd. (b)(1)(C)). The trial court stayed imposition of sentence on the section 12022.5, subdivision (a), and section 12022.53,

subdivision (b), enhancements.[7]  The court imposed a term of two years on count two, possession of a firearm by a felon (§ 29800, subd. (a)(1)), and stayed execution of that sentence.

## DISCUSSION

### I.  Confrontation Clause Claim

Defendant contends that the trial court impermissibly allowed the prosecution's gang expert to relay testimonial hearsay to the jurors in violation the confrontation clause and *Crawford, supra*, 541 U.S. 36.  In his original briefing, defendant argued that, under the then-recent United States and California Supreme Court case law, the practice of permitting a gang expert to convey testimonial hearsay statements to jurors in discussing the bases for the expert's opinion had lost its viability.  While this appeal was originally pending, our high court decided *Sanchez, supra*, 63 Cal.4th 665, and we granted defendant's motion for supplemental briefing.  We agreed with the People that defendant forfeited these claims by failing to object in the trial court.  Reconsidering the issue in light of *Perez, supra*, 9 Cal.5th 1, we conclude defendant has not forfeited his contention.

### A.  *Crawford* and *Sanchez*

In *Crawford*, the United States Supreme court held that the admission of testimonial hearsay violates the confrontation clause unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford, supra*, 541 U.S. at pp. 53-54, 59.)  However, the court further stated that the confrontation clause does not prohibit the admission of testimonial statements for purposes other than establishing the truth of the matter asserted.  (*Id*. at p. 59, fn. 9.)

---

[7]  Although not raised by the parties, we address the trial court's failure to impose a sentence on each of these enhancements and then stay execution thereof in part X. of the Discussion, *post*.

17

In *Sanchez,* our high court considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion," and held that "case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law." (*Sanchez, supra*, 63 Cal.4th at p. 670.) The *Sanchez* court defined "[c]ase-specific facts [as] those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) The *Sanchez* court further held that some of the hearsay statements in that case were also testimonial and should have been excluded under *Crawford*. (*Sanchez*, at pp. 670-671.)

Our high court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. omitted.) In adopting these rules, the *Sanchez* court disapproved of its pre-*Crawford* decisions which held that the matters upon which an expert relied as the bases of the expert's opinion were not offered for their truth. (*Sanchez*, at p. 686, fn. 13.) The *Sanchez* court specifically disapproved of *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*), disapproved in *Sanchez* at page 686, footnote 13, inasmuch as "it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, at p. 686, fn. 13.)

## B.  Forfeiture and *Perez*

"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This

18

applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 198.) As noted by the United States Supreme Court, states may apply this rule to federal confrontation clause objections. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 313, fn. 3 [174 L.Ed.2d 314, 323, fn. 3] ["The right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections"].) Such a rule can be found in Evidence Code section 353,[8] and our high court has repeatedly noted that a timely and specific objection on confrontation grounds is required to preserve confrontation clause violation theories on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 729, citing Evid. Code, § 353; see also *People v. D'Arcy* (2010) 48 Cal.4th 257, 290; *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8; *People v. Dennis* (1998) 17 Cal.4th 468, 529; *People v. Alvarez* (1996) 14 Cal.4th 155, 186.) The requirement of an objection on specific grounds "gives both parties the opportunity to address the admissibility of the evidence so the trial court can make an informed ruling, and creates a record for appellate review." (*People v. Davis* (2008) 168 Cal.App.4th 617, 627 (*Davis*).) Making the objection in the trial court also gives the proponent of the evidence an opportunity to cure the defect in the evidence if possible (*People v. Pearson* (2013) 56 Cal.4th 393, 438), or forgo introducing all or some of the evidence. In other words, a specific objection gives the proponent of the evidence the opportunity to take "steps designed to minimize the prospect of reversal." (*People v. Morris* (1991) 53 Cal.3d 152, 187-188, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) " '[I]t is unfair to the trial judge

---

[8] In pertinent part, Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to *make clear the specific ground of the objection* or motion." (Italics added.)

19

and to the adverse party to take advantage of an error on appeal when it could easily have been corrected at the trial.' " (*Davis*, at p. 627, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444-445.)

Defendant contends that, notwithstanding the absence of any specific objection in the trial court on the relevant grounds, he has not forfeited his claim because any objection would have been futile under case law as it existed at the time. Defendant points out that the decisional law at the time provided that an expert witness could testify as to the material that forms the basis of his or her opinion, even if it would otherwise be inadmissible. (*Gardeley, supra*, 14 Cal.4th at pp. 618-619; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*).) Defendant further notes that prior decisional law also held that because such testimony is not offered for the truth of the matter, but rather to explain the gang expert's testimony, it did not violate the confrontation clause. (*Thomas*, at pp. 1209-1210.) According to defendant, any attempt to register a specific confrontation clause objection would have been futile at the time and, as a consequence, the failure to do so should be excused.

We originally concluded that, because defendant did not register a confrontation clause objection, he had forfeited his contentions. Subsequently, our high court in *Perez* held that a defendant does not forfeit a *Sanchez* contention where the defendant failed to object on that ground prior to *Sanchez*. (*Perez, supra*, 9 Cal.5th at pp. 4, 9.) Moreover, our high court expressly disapproved of our forfeiture determination in *Blessett*. (*Id*. at p. 14.) Under *Perez*, it is clear that defendant did not forfeit his contentions and that they are properly before us.

### C. The Gang Expert's Testimony and *Valencia*

We now turn to the expert's testimony to consider what portions of this testimony should not have been relayed to the jury under the principles announced in *Sanchez* as clarified by *Valencia*. We first look at his testimony regarding the prior crimes and

contacts defendant had with law enforcement used as part of the basis for the expert's opinion that defendant was a member of the Meadowview Bloods.

The prosecution's gang expert testified about the following events, which served as part of the basis for his opinion concerning defendant's gang membership: the November 1991 incident when defendant was shot in the back allegedly in relation to a rivalry between the Oak Park Bloods and the Meadowview Bloods; the December 1992 incident where defendant was arrested for a felony warrant and admitted possession of rock cocaine found at the location; the June 1993 incident when he was in a car with another when a firearm was found in the car; an incident in October 1993 when, while running from the police, he displayed a firearm and was shot by the officer; the January 1995 police contact involving a domestic violence call; his commission of armed robbery in September 1995; and his commission of unspecified gang crimes in April 2002 with a Del Paso Heights Blood. These events each had gang overtones related to the people with whom defendant was associated at the time, the nature of the crime being consistent with the primary activities of the Meadowview Bloods, defendant's identification as a Meadowview Blood at the time, the color of the clothes defendant was wearing, or the discovery of gang writing and defendant's tattoo.

The People now concede that this testimony was hearsay, testimonial, and case-specific under *Sanchez* and *Valencia*, and we agree.[9] We shall discuss whether defendant was prejudiced by the admission of this evidence in part I.D of the Discussion, *post*.

---

[9] In beginning the direct examination concerning defendant's prior crimes and police contacts, the prosecutor asked the expert whether he "had an opportunity to review [defendant]'s background and a number of the contacts that he's had." The expert said he had. The prosecutor did not ask whether the expert reviewed police reports and/or similar materials, and the expert did not volunteer as much. However, the expert did not begin working with the police department until 2000 and was not assigned to the problem-oriented policing team addressing gang activity until three years later.

21

In addition to the hearsay upon which the expert relied in opining about defendant's gang membership, defendant also objects on *Crawford/Sanchez* grounds to the expert's testimony concerning the predicate offense testimony offered to establish that the Meadowview Bloods is a criminal street gang. To establish that an organization is a criminal street gang, the prosecution must prove, among other things, that the group has engaged in a pattern of criminal conduct, and this requires a showing that the group has engaged in the requisite number of enumerated predicate offenses. (§ 186.22, subd. (e).) As stated *ante*, the gang expert testified about predicate offenses involving three Meadowview Blood members, none of whom were defendant.

Defendant asserted in his original briefing that admission of the gang expert's testimony relaying the facts of the predicate offenses violated his confrontation clause rights. In his supplemental reply brief, defendant asserted that the facts necessary to prove a pattern of criminal gang activity pursuant to section 186.22 are case-specific facts within the meaning of *Sanchez* because they are facts used to prove the gang enhancement which is charged in the particular case.

In *Valencia, supra*, 11 Cal.5th 818, our high court clarified its view of what constitutes case-specific and background facts. As noted, it had held in *Sanchez* that case-specific facts are facts that relate to "the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.) In *Valencia*, the court wrote: "We acknowledge that the statutorily required predicate offenses do not fit neatly into the description *Sanchez* provided. At least some of these offenses will most often have occurred before 'the case being tried' [citation] and will

Consequently, the expert's knowledge of virtually all of these matters could not have been based on firsthand knowledge or anything other than police reports and the like. Also, on this record, there is no indication that any of the statements qualified under any exception to the hearsay rule. Furthermore, these matters all related to defendant and were thus case-specific facts since they related to a "participant[] alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.)

have been committed by others who were not involved in the new charges at issue. But *Sanchez* was addressing case-specific facts as they arose in the particular matter at hand; it did not address the question we face here." (*Valencia*, at p. 839.) The court explained: "To determine whether predicate offenses are case-specific or background facts, we must look beyond an isolated phrase in *Sanchez* and instead probe the underlying rationale permitting experts to rely on and relate certain hearsay." (*Id*. at p. 835.) Experts are given latitude to testify about "background information regarding [their] knowledge and expertise and *premises generally accepted in [their] field*." (*Ibid*.) The "[h]allmarks of background facts are that they are generally accepted by experts in their field of expertise, and that they will usually be applicable to all similar cases. Permitting experts to relate background hearsay information is analytically based on the safeguard of reliability." (*Id*. at p. 836.) Thus, when "experts give testimony that goes beyond their own experience or beyond principles generally accepted in their field, the justifications for allowing greater evidentiary latitude cease to apply." (*Ibid*.) Based on this reasoning, our high court held that testimony like that given here related to predicate offenses is not background information; thus, predicate offenses "may not be established solely by the testimony of an expert who has no personal knowledge of facts otherwise necessary to satisfy the prosecution's burden." (*Id*. at pp. 826, 838-839.)

Here, defense counsel asked the gang expert on cross-examination whether he was "actively involved in" the case involving the three Meadowview Bloods gang members who committed the predicate offenses about which he testified. The gang expert responded, "[a]s far as the investigation, no." Thus, it is apparent that the gang expert's testimony about these predicate offenses was not based on his personal knowledge, and was instead case-specific hearsay. It appears that the expert's testimony was based his review of police reports. (See fn. 9, *ante*.) Consequently, it was likely testimonial hearsay. (See *Sanchez, supra*, 63 Cal.4th at pp. 694-695 [formal police reports may be made with the requisite degree of formality or solemnity as to constitute testimonial

23

hearsay].)  Under *Valencia*, we conclude the testimony was inadmissible case-specific hearsay.

### D.  Prejudice

We turn to the question of whether defendant was prejudiced by the introduction of case-specific testimonial hearsay.  As we discuss in more detail, *post*, we conclude the errors in admitting the gang expert's testimony concerning defendant, his prior offenses, and his contacts with law enforcement were harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*) as to the charged offenses and firearm enhancements.

However, upon removing the gang expert's inadmissible case-specific hearsay testimony about the predicate offenses from the equation, there is not sufficient evidence in the record to prove the existence of two or more predicates (§ 186.22, subd. (e)), and thus there is insufficient evidence to establish the "pattern of criminal gang activity" (§ 186.22, subd. (f)) element of the gang enhancement allegation (§ 186.22, subd. (b)(1)). The admission of the expert's case-specific hearsay on this subject, therefore, was not harmless beyond a reasonable doubt, and we will reverse the true finding on the section 186.22, subdivision (b)(1) gang enhancement allegation.

Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*); accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 3.)  "The harmless error inquiry asks:  'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Geier*, at p. 608; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*).)  To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine *the entire record* and must reverse if there is a ' " 'reasonable possibility' ' ' that the error contributed to the verdict."

24

(*People v. Reese* (2017) 2 Cal.5th 660, 671 (*Reese*), italics added, citing *People v. Aranda* (2012) 55 Cal.4th 342, 367 (*Aranda*).)

Our review requires that we address prejudice as to each count and enhancement.

**1. First Degree Murder (§§ 187, 189)**

Given the admissible evidence heard by the jury, we conclude that the error was harmless beyond a reasonable doubt as to the first degree murder conviction. Given the other evidence, there is no reasonable possibility that Saario's testimonial hearsay testimony about defendant's prior contacts with the police contributed to the jury's verdict.

At trial, defendant did not dispute that he shot Sisoukchaleun twice, once in the face and once in the torso, and that Sisoukchaleun died as a result. Defendant's theory was that he had acted in self-defense or imperfect self-defense. But the evidence showed defendant did not act in either complete self-defense or imperfect self-defense, and there was compelling evidence of planning, motive, and manner of killing. Courts look to evidence of planning, motive, and manner of killing as guidelines to assess the sufficiency of evidence establishing deliberation and premeditation (see generally *People v. Sandoval* (2015) 62 Cal.4th 394, 424; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27), and we find it useful to use those guidelines to organize the following discussion.

The jury heard evidence from Vue, Thammavongsa, and Manivong concerning the circumstances leading up to the altercation, culminating in defendant shooting Sisoukchaleun. Their testimony was augmented by the surveillance video.

With regard to planning, the trial evidence demonstrated that defendant walked out from where he had been standing in the recessed entry of the liquor store to the sidewalk in front of the entry as Sisoukchaleun and Thammavongsa approached from one direction and Manivong and Ketphanh approached from the opposite direction. There on the sidewalk, defendant exchanged words with the group. He then turned and followed some of the group back into the recessed entry. Vue testified that, while the conversation had

25

not been aggressive at its inception, as it proceeded, the African-American man "got into Bud's face."

When the truck pulled up, defendant turned back toward the street and left the entryway, unimpeded, leaving Sisoukchaleun's group in the entryway. Defendant then went to his pickup truck and retrieved a gun. Instead of getting in his truck and leaving the scene, defendant chose to re-engage Sisoukchaleun's group. The video shows that at this point, Sisoukchaleun's group was still in the recessed entryway of the liquor store while defendant was on the sidewalk some distance away. Defendant's demeanor is animated and he appears to be angry. The video shows Sisoukchaleun taking off his shirt. He then walked toward defendant, momentarily confronted him, and then walked into the street.

After Sisoukchaleun walked into the street, an unidentified African-American man approached defendant from the recessed entryway with his arm extended, placed his arm over defendant's chest, and appeared to speak to defendant in an effort to get defendant to disengage. Defendant pointed his finger at that person's chest and then walked toward the street, away from the cab of the truck, and out of the camera frame. The evidence showing defendant retrieving the gun, reengaging Sisoukchaleun, refusing to disengage, and following Sisoukchaleun into the street just prior to the shooting was indicative of planning.

As for motive, the jury properly had before it witness testimony that defendant invoked the name of the Meadowview Bloods criminal street gang after Sisoukchaleun and Manivong walked up making hand gestures and Thammavongsa and Sisoukchaleun uttered the term "cuz." After defendant invoked the name of Meadowview Bloods, Sisoukchaleun invoked the name of the LGC or Lao Gangster Crip, with which both Thammavongsa and Sisoukchaleun were affiliated. Thammavongsa acknowledged that such an exchange amounted to "fighting words" because Bloods and Crips do not get along. Based on a hypothetical set of facts, the gang expert properly testified that the

26

exchange would constitute a "drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods." The expert also testified: "At that point, the individual -- once he puts out, 'I'm a Blood,' you know . . . this is not gonna go anywhere good."

Additionally, the expert testified that he personally observed defendant's "Meadowview" tattoo at trial. This was further evidence of defendant's gang affiliation, and this evidence was admissible under *Sanchez*. (*Sanchez, supra*, 63 Cal.4th at p. 677 [a defendant's tattoo is a case-specific fact that may be established by a witness who saw the tattoo and the fact that the tattoo's design is a symbol that has been adopted by a criminal street gang is background information about which a gang expert may testify].)

Regarding defendant's gang affiliation, the jury also heard defendant's jail phone conversations. In one conversation, he and the person with whom he spoke referred to each other as "blood" several times. As the gang expert explained, Blood gang members commonly refer to one another by the word, "blood." In another conversation, defendant talked about having previously been shot by a Crip " 'because it was sort of a gang shooting' " and that he was housed near a Crip in the jail, but he did not care " '[l]ong as that nigga don't say nothing crazy.' " What can be inferred from this evidence is that, unlike the Crip with whom defendant was housed in the jail, Sisoukchaleun had said something "crazy" to defendant by disrespecting defendant and his criminal street gang. The motive here was quite obviously gang related, even without the case-specific testimonial hearsay in the gang expert's testimony.

As for manner of killing, after defendant retrieved his firearm from the truck and re-engaged Sisoukchaleun, he followed Sisoukchaleun into the street where Sisoukchaleun apparently thought they would engage in a fist fight. Instead, defendant shot Sisoukchaleun twice after Sisoukchaleun threw one wild punch. The first shot was aimed at Sisoukchaleun's face, right between the eyes, and was fired at almost point-blank range. Defendant fired a second shot into the side of his Sisoukchaleun's torso,

27

also from close range. The parts of the body defendant targeted showed a cold, calculated, and deliberate effort to end Sisoukchaleun's life.

In addition to the very strong evidence of planning, motive, and manner of killing, there was also evidence evincing defendant's consciousness of guilt. When he was arrested later in the day, the pants with the distinctive red design he had worn earlier during the shooting were in a bag. Also found in the car in which defendant was riding were the license plates from his truck. After he finished urinating at a police facility restroom, he was told not to wash his hands. Defendant looked at the detective and washed them anyway. As a consequence, a gunshot residue test could not be done. When interviewed by the police, defendant claimed someone had stolen his truck. He repeated that lie to others. He said that was his story and he was "sticking with it."

Defendant contends that the jury rejected self-defense and imperfect self-defense because of the testimony concerning his prior law enforcement contacts. Instead of leaving after the initial confrontation,[10] defendant retrieved the gun from his pickup. There was no evidence that Sisoukchaleun or anyone in his group had any weapons or threatened to use weapons. Nor was there any evidence of a threat to inflict great bodily injury upon defendant or to use any type of lethal force.[11] The only force defendant

_____

[10] We realize, of course, that an assailed person has no duty to retreat and is entitled to stand his ground or pursue the assailant until the danger of bodily injury or death has passed, even if safety could have been achieved by retreating. (*People v. Hughes* (1951) 107 Cal.App.2d 487, 494; see also CALCRIM No. 505.) But nobody attacked defendant and nobody displayed any weapons. There had only been a challenge to fight. And in any event, we may consider defendant's failure to leave when he had a chance, his re-engagement with the victim, his refusal to disengage and his conduct in following the victim into the street instead of leaving as evidence that defendant did not shoot the victim because he was in fear of the immediate use of deadly force against him.

[11] In a petition for rehearing, defendant asserted the video shows Thammavongsa "raising and lowering his arm in an angry gesture as the group surrounds defendant." (Petn. for

faced is evidenced by Sisoukchaleun's challenge, " 'Let's fight' " and his preparation to do so by taking off his shirt. While the dissent states the evidence "did not foreclose a finding that Sisoukchaleun was the aggressor," the evidence shows Sisoukchaleun's aggression was limited to a fight and defendant responded by following him into the street and shooting him between the eyes; defendant's use of force relative to the threat of a fight was clearly excessive and unreasonable.

Indeed, defendant's targeted, nearly point-blank gunfire reflected, as we have said, a cold calculated effort to take Sisoukchaleun's life. The exacting nature of defendant's strategically placed shots were not reflective of a panicked self-defensive response to imminent lethal force about to be used against him.

Defendant asserts that he was "surrounded" at the recessed entrance by Sisoukchaleun's group, and the dissent states perhaps defendant went back into the recessed entrance not to confront but to get his liquor. But the video shows that defendant followed Sisoukchaleun's group into the recessed area. They did not surround him; rather, he put himself in their proximity. Moreover, after he retrieved his gun, defendant never actually went back into the recessed entrance. He approached it, but stood on the sidewalk, several feet away from the entrance, gesticulating. Meanwhile, the woman who drove up in the truck walked past defendant and into the recessed area, moving among the "group of hostile Crip affiliates" defendant now says he feared.

_____

rehg., pp. 8-9.) We disagree. At the point defendant cites in the video, defendant walked out from the recessed entry to meet Sisoukchaleun's group on the sidewalk and words were exchanged. Thammavongsa walked around defendant into the recessed entry. Defendant turned and followed Thammavongsa, who raised his arm and hand toward the glass, appearing to gesture to someone or something in the store. Thereafter, he stood with his back to the glass and defendant stood facing Thammavongsa. Defendant's back was facing the rest of Sisoukchaleun's group. It was only because defendant joined Sisoukchaleun's group in the entryway that they were around him. The video does not show Thammavongsa making the gesture towards defendant he describes in his petition for rehearing.

29

As noted, a person then came out of the recessed area, put his arm out, situated himself in front of defendant and appears to have tried to get him to disengage. Defendant, after pointing his finger at that person's chest twice, walked around him and followed Sisoukchaleun into the street. Defendant was neither surrounded by anyone at that time, nor was he trying to get his liquor. Nor was he walking back to his truck, as defendant now claims in his supplemental briefing. The video shows him walking parallel to and a distance away from the truck, not toward the passenger door.

Critically, defendant's claim of self-defense was inconsistent with the story he early on said he was sticking to. During his interview with the police and the numerous phone conversations defendant had with people from the jail, he claimed he was not the shooter. He never made any claim of self-defense or indicated in any way that he felt threatened.[12] Defendant's lies, concealment, and destruction of evidence evinced not only his general consciousness of guilt, but more particularly, that he knew he had not acted in self-defense. Given the evidence, we conclude that a reasonable jury would have rejected defendant's self-defense and imperfect self-defense arguments even if it had not heard the testimony concerning defendant's prior law enforcement contacts.

Lastly, we again note the gang overtones to this shooting. Self-defense is unavailable where a defendant kills not because of fear of death or great bodily injury *alone*, but also based on a desire to kill a rival because of gang-related animus. (*People v. Kaihea* (2021) 70 Cal.App.5th 257, 266, citing *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 [self-defense available only where defendant acts based on fear alone].)

---

[12] Defendant now argues he made these statements during his phone conversations because they were not private and had he admitted shooting a Crip, he would have risked retaliation. Defendant would have us ignore — and apparently asked the jury to ignore — that his first opportunity to claim self-defense was when he spoke to the police. Instead of telling police he acted in self-defense, however, he gave them the same story he initially thought he could stick to — his truck was stolen and he was not involved.

Consistent with this principle, defendant's jury was instructed: "The Defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and *he must have acted only because of that belief*." (CALCRIM No. 505, italics added.) The evidence simply does not support a finding that defendant fired fatal shots between Sisoukchaleun's eyes and into his torso *solely* because he feared lethal force was about to be inflicted upon him.

Based on the totality of the evidence, we conclude that it is clear beyond a reasonable doubt a rational jury would have still found defendant guilty of first degree murder absent the gang expert's objectionable case-specific testimonial hearsay. (*Geier, supra*, 41 Cal.4th at p. 608.) There is no reasonable possibility that the error contributed to the verdict. (*Reese, supra*, 2 Cal.5th at p. 671; *Aranda, supra*, 55 Cal.4th at p. 367.)

### 2. Possession of a Firearm by a Felon (§ 29800, subd. (a)(1))

The parties stipulated that defendant previously had been convicted of a felony. There is no dispute that defendant possessed a firearm. The video shows defendant going to the pickup truck to retrieve it. Witnesses testified that, in the midst of the altercation with Sisoukchaleun in the street, defendant pulled out a gun. Manivong heard a woman say, " 'He's got a gun.' " Defendant then shot Sisoukchaleun twice.

This evidence established a violation of section 29800, subdivision (a)(1). There is no reasonable possibility that the objectionable testimonial hearsay from the gang expert contributed to the jury's guilty verdict.

### 3. Firearm Enhancements (§§ 12022.53, subds. (b), (d), 12022.5, subd. (a))

In the commission of murder, defendant personally and intentionally discharged a firearm causing Sisoukchaleun's death. Again, defendant did not dispute shooting Sisoukchaleun. He only maintained that he did so in self-defense or imperfect self-defense. Subdivision (*l*) of section 12022.53 provides that "[t]he enhancements specified in this section shall not apply to the lawful use or discharge of a firearm . . . by any

31

person in lawful self-defense, lawful defense of another, or lawful defense of property, as provided in Sections 197, 198, and 198.5." However, the jury appropriately rejected defendant's claims of self-defense and imperfect self-defense and would have done so without the inadmissible expert testimony given the evidence we recounted in our discussion of defendant's first degree murder conviction. There is no reasonable possibility that the errors in the admission of the expert's case specific testimonial hearsay contributed to the true findings on the firearm enhancements.

### 4. Criminal Street Gang Enhancement (§ 186.22, subd. (b)(1))

To prove the section 186.22, subdivision (b)(1) enhancement, the People were required to prove defendant committed the murder for the benefit of a criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members. (§ 186.22, subd. (b)(1); CALCRIM No. 1401; *Gardeley, supra*, 14 Cal.4th at pp. 616-617.) It is important to note that the case-specific testimonial hearsay concerning defendant's prior crimes and law enforcement contacts was introduced to show that defendant was a Meadowview Bloods gang member. Yet, the prosecution need not prove that a defendant is an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1). (*Sanchez, supra*, 63 Cal.4th at p. 698; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207.) Evidence of gang membership helps establish a defendant's intent to assist, further, or promote criminal conduct by gang members, but it is not an element of the enhancement. (*Sanchez*, at pp. 698-699.)

More concerning is the issue of the predicate offenses (§ 186.22, subd. (e)) required to prove the "pattern of criminal gang activity" element (§ 186.22, subd. (f)). As stated *ante*, the gang expert's testimony about the predicate offenses committed by three Meadowview Bloods gang members was case-specific hearsay, as the expert had no

personal, firsthand knowledge about those facts, and thus this testimony was improperly admitted.

The record does contain certified court records for the convictions the three individuals sustained as a result of the incident about which the expert testified. Those certified court records were independently admissible and, as a general matter, could be competent evidence to prove the predicate offenses. (Evid. Code, § 452.5.) However, the facts to be gleaned from those records do not supply sufficient proof of a predicate offense.

According to the certified court records, one of the three individuals, England, was convicted only of active participation in a criminal street gang. (§ 186.22, subd. (a).) However, this is not one of the enumerated offenses that can qualify as a predicate offense under subdivision (e) of section 186.22.

Another individual, Nase, was convicted of both active participation in a criminal street gang (§ 186.22, subd. (a)) and battery (§ 243, subd. (d)). Neither of these convictions is a predicate offense under subdivision (e) of section 186.22.

The third individual, Love, was convicted of offenses enumerated in subdivision (e) of section 186.22. Among other things, Love was convicted of first degree burglary (§ 459), which is set forth in subdivision (e)(11) of section 186.22, and assault by means of force likely to cause great bodily injury (§ 245, former subd. (a)(1)), enumerated at section 186.22, subdivision (e)(1). However, critically, as to every gang enhancement allegation, alleging that Love committed his crimes for the benefit of, at the direction of, or in association with a criminal street gang, specifically Meadowview Bloods, the jury found the allegations not true. Additionally, the jury found Love not guilty of active participation in a criminal street gang. (§ 186.22, subd. (a).) Thus, while the certified court records establish Love was convicted of offenses enumerated in section 186.22, subdivision (e), they do not establish, independent of gang expert's testimony, that he did so as a member of the Meadowview Bloods. The gang expert's testimony that Love was

a Meadowview Bloods member could not furnish this missing element because there is no reason to conclude on this record that it was based on anything other than inadmissible case-specific hearsay like the rest of his testimony on this subject.

Thus, there is not sufficient evidence to satisfy the predicate offense requirement (§ 186.22, subd. (e)) to prove a pattern of criminal gang activity (§ 186.22, subd. (f)) and to support the true finding on the gang enhancement allegation (§ 186.22, subd. (b)(1)). As a result, we cannot find the error in admitting the gang expert's case-specific hearsay testimony about the predicates was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at p. 24.) The gang enhancement allegation true finding must be reversed. In light of this determination, we need not further address whether defendant was prejudiced by the gang expert's case-specific hearsay testimony concerning defendant's prior crimes and police contacts.

### 5. Prejudice—Conclusion

Given the eyewitness testimony, video surveillance recording, and defendant's post-offense statements and conduct, it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty of this cold blooded deliberate and premeditated murder and of being a felon in possession of a firearm, and found the firearm enhancement allegations true, absent the errors. (*Livingston, supra*, 53 Cal.4th at p. 1159; *Geier, supra*, 41 Cal.4th at p. 608.) We conclude beyond a reasonable doubt that defendant suffered no prejudice as to the substantive charges or the firearm enhancement allegations based on the admission of the gang expert's case-specific testimonial hearsay.[13] The error here did not contribute to the first degree murder verdict, the

---

[13] " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982 (*Carrasco*), quoting *Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674] (*Strickland*).) Thus, we need not

34

firearm possession verdict, or the firearm enhancement true findings, and thus the People have satisfied their burden of establishing that the errors were harmless beyond a reasonable doubt in relation to these matters. However, as we have explained, in the absence of competent proof to establish the existence of at least one additional predicate offense (§ 186.22, subd. (e)) in addition to the charged offenses, there is insufficient evidence to establish the "pattern of criminal gang activity" element (§ 186.22, subd. (f)) of the gang enhancement allegation (§ 186.22, subd. (b)(1)). Accordingly, defendant was prejudiced as to the gang enhancement allegation, the true finding on which we must reverse.

## II.  Instructional Error Claim—Prior Uncharged Misconduct

Defendant contends that the trial court's instructions allowed the jurors to consider evidence of his prior offenses as substantive evidence, and invited the jurors to employ this evidence to draw impermissible inferences of intent and motive as well as criminal propensity. Defendant argues limiting instructions were required. He asserts that these errors were prejudicial and rendered his trial fundamentally unfair.

We conclude that the trial court was not required to provide additional limiting instructions sua sponte, and the instructions it provided were correct on the law.

### A.  CALCRIM Nos. 332 and 1403 and Defendant's Contentions

Defendant's contentions focus on the language we have italicized below in two jury instructions, CALCRIM No. 332 on evaluating expert testimony, and CALCRIM No. 1403 on the limited purpose of gang evidence.

---

address defendant's contentions that counsel's performance fell below an objective standard of reasonableness based on failure to make timely and specific objections under these provisions of the Evidence Code. Having concluded beyond a reasonable doubt that defendant did not suffer prejudice under the stricter *Chapman* standard on all charges and enhancements other than the gang enhancement, defendant could not possibly demonstrate prejudice under the less stringent *Strickland* standard applicable to ineffective assistance of counsel claims. And, of course, any additional prejudice as to the gang enhancement is superfluous in light of our determination.

Regarding CALCRIM No. 332, in pertinent part the court told the jury: "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any reason, [*sic*][14] and the facts or information on which the expert relied in reaching that opinion. [¶] *You must decide whether information on which the expert relied was true and accurate.* You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332, as given, italics added.)

Regarding CALCRIM No. 1403, in pertinent part, the court instructed the jury: "*You may consider evidence of gang activity only . . . for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related enhancement charged or that the defendant had a motive to commit the crime charged.* [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider . . . the facts and information relied on by an expert witness in reaching his opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." (Italics added.)

Defendant contends that the combined effect of CALCRIM Nos. 332 and 1403 was to invite the jury to consider the gang expert's basis testimony regarding defendant's prior crimes and police contacts as substantive evidence to establish the gang enhancement mens rea elements and motive to commit the crime. This, according to

_____

**14** The written instructions provided to the jury accurately states: "the reasons the expert gave for any *opinion . . . .*" (Italics added.) Defendant appropriately does not complain about this discrepancy on appeal. " 'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' " (*People v. Mills* (2010) 48 Cal.4th 158, 201.)

defendant, is the combined effect of the language in CALCRIM No. 332 telling the jurors to "decide whether information on which the expert relied was true and accurate" and language in CALCRIM No. 1403 telling the jurors they could consider gang activity evidence for the purposes of determining defendant's intent, purpose, and knowledge required for the gang enhancement or motive to commit the crime, coupled with the failure to instruct the jurors that they could not consider the expert's basis testimony for the truth. Defendant complains the jury should not have been allowed to use the expert's basis testimony related to the prior crimes in which defendant was involved for either of the purposes mentioned in CALCRIM No. 1403 because the evidence was not admitted for these purposes. Rather, the expert's testimony concerning defendant's prior crimes was allowed only to show the information upon which the expert's opinion regarding defendant's gang affiliation was based. Defendant also contends the instructions invited the jury to use other crimes evidence to draw an impermissible propensity inference about his character. We address the latter contention first.

## B. Analysis

### 1. Propensity Contention

Defendant appears to complain that the jury should have been instructed that it could not infer from the expert's prior crime testimony that defendant acted in conformity with a character trait for violence. However, as defendant acknowledges, the trial court was not required to give an " 'other crimes' " evidence instruction sua sponte. (*People v. Cottone* (2013) 57 Cal.4th 269, 293; *People v. Nottingham* (1985) 172 Cal.App.3d 484, 497 (*Nottingham*).) The California Supreme Court has " 'consistently held that where . . . a defendant fails to request an instruction, a trial court "generally [has] no duty to instruct on the limited admissibility of evidence." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 529, quoting *People v. Valdez* (2012) 55 Cal.4th 82, 139, *People v. Lang* (1989) 49 Cal.3d 991, 1020, & Evid. Code, § 355 ["When evidence is admissible . . . for one

purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly" (italics added)].)

Nevertheless, as defendant correctly notes, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) Further, "[e]ven if such an instruction is not required, when a trial court does undertake to give a limiting instruction specifically calling attention to the significance of the substantially prejudicial evidence of prior bad acts, it should do so accurately." (*Nottingham, supra*, 172 Cal.App.3d at p. 497.) Defendant implies the instructions provided here were inaccurate. We disagree. The limiting instruction in CALCRIM No. 1403 was not inaccurate or incorrect on the law.

The case on which defendant relies as an example of inaccurate instructions allowing a jury to draw an impermissible inference of criminal propensity is not helpful to him. In *People v. Garceau* (1993) 6 Cal.4th 140, 156, 163 (*Garceau*), disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118, evidence was introduced that the defendant, charged with killing Maureen Bautista and her son Telesforo, also committed the uncharged murder of the defendant's associate, Greg Rambo. (*Garceau*, at pp. 163-165.) The trial court instructed the jury that it could consider the other crimes evidence, if believed, " 'for any purpose, including but not limited to any of the following: [¶] [Defendant's] *character or any trait of his character. . . .*' " (*Id*. at pp. 185-186, italics omitted & italics added.) On appeal, the People conceded that this instruction was "overbroad." (*Id*. at p. 186.) The California Supreme Court concluded that the trial court erred in giving the italicized portion of the instruction, observing that, subject to certain inapplicable exceptions, "evidence pertaining to a defendant's character is inadmissible when offered to prove the defendant's conduct on a specific occasion." (*Ibid*., citing Evid. Code, § 1101, subd. (a).) Our high court stated that this instruction "impermissibly invited the jury to consider

38

certain evidence (e.g., that defendant killed Rambo) for the purpose of establishing defendant's propensity to commit murder." (*Garceau*, at p. 186.) The court continued: "Assuming the jury considered such evidence in that context, the jury arguably might have inferred that because defendant had killed Rambo, defendant also was capable of killing other friends, such as Maureen and Telesforo Bautista. If the jury drew that inference, the prosecution's burden of proof as to the central issue in the case, the identity of the Bautistas' slayer, arguably was lightened, thus raising the possibility that defendant's constitutional right to due process of law was impaired." (*Ibid*.)

The instruction given in *Garceau* expressly invited the jury to consider evidence of uncharged crimes as proof of the defendant's character and his propensity to commit murder. Here, no such instruction was given; the jury was not told it could consider any evidence to establish defendant's criminal propensity to commit murder or any other crime.

CALCRIM No. 1403 did not focus on *other crimes evidence*; rather, the focus was more broadly related to *gang activity evidence*. The evidence of gang activity included the testimony of the witnesses, including their testimony about the gang-related statements defendant made prior to the murder, defendant's phone conversations while he was in jail, his tattoo, and the gang expert's testimony about gang culture. The gang activity evidence, of course, also included the expert's opinion about defendant's Meadowview Bloods membership, which was based, in part, on defendant's phone conversation in the jail, his tattoo, and his conduct during the charged offense, as well as the circumstances of defendant's prior crimes.[15] CALCRIM No. 1403 limited the

---

[15] Defendant does not assert in his post-transfer briefing that the jury should not have considered the evidence of his prior crimes because it was inadmissible under *Valencia*, *supra*, 11 Cal.5th 818. Any such contention is forfeited. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218 [failure to raise claim at any time prior to reply brief forfeited];

purpose for which the jury could consider the totality of the gang activity evidence to a determination of the intent, purpose and knowledge required to prove the gang-related enhancement, the motive to commit the murder, an evaluation of the credibility of witnesses and a consideration of the facts and information relied on by the expert witness in reaching his opinion. The instruction expressly told the jury: "You may not consider this evidence for any other purpose. *You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.*" (Italics added.) Thus, as the italicized text reflects, the jury was expressly told not to draw an impermissible criminal propensity inference from any of the gang activity evidence. This necessarily included the expert's basis testimony. We presume the jury followed these instructions. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196 (*Letner and Tobin*).) Accordingly, we reject defendant's contention that the instructions impermissibly directed the jurors to consider the other crimes evidence upon which the expert relied in opining that defendant was a Meadowview Blood as evidence that defendant had criminal propensities and that he acted in conformity therewith on this particular occasion.

To the extent that these proper instructions somehow could have been understood to allow the jury to draw an impermissible criminal propensity inference from the gang expert's basis testimony about defendant's prior crimes and such an inference could have been prevented by an additional limiting instruction, it was incumbent upon the defense to request that such an instruction be provided. A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.

---

*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

40

(*People v. Jones* (2013) 57 Cal.4th 899, 969 [to the extent court's instruction on other crimes evidence was incomplete, defendant may not be heard to complain because he did not request clarifying language].) Thus, any instruction specifically telling the jury not to infer criminal propensity from the gang expert's basis testimony about defendant's prior crimes and police contacts was one that the defense should have requested. The trial court was not required to provide such an instruction sua sponte.

## 2. Other Crimes Evidence and Proof of Mens Rea Elements and Motive

Defendant contends that, based on the instructions given and the absence of an additional limiting instruction, the jurors were permitted to use the other crimes evidence as substantive evidence of the gang enhancement mens rea elements and motive. As we understand the argument, defendant essentially contends that the gang expert's basis testimony regarding defendant's prior offenses was allowed to be used as Evidence Code section 1101, subdivision (b) evidence. (See fn. 15, *ante*.) We disagree. The jury was properly permitted to consider the evidence of gang activity, including the expert's opinion that defendant was a member of a criminal street gang, as evidence that defendant "acted with the intent, purpose and knowledge that are required to prove the gang-related enhancement charged; [¶] OR [¶] [that] the defendant had a motive to commit the crime charged."

Defendant's contention appears to be grounded on a combination of the fact that the jury was not instructed that the gang expert's basis testimony could not be considered for the truth, but was instructed, as set forth in CALCRIM No. 332, to decide whether information upon which the expert relied was true and accurate. But defendant ignores the limited purpose for which the jury was instructed to consider the truth and accuracy of the information upon which the expert relied. CALCRIM No. 332 expressly relates to evaluating the believability and credibility of expert testimony. The instruction told the jury to "consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, *and the facts or information on which the expert*

41

*relied in reaching that opinion.*" (Italics added.) The instruction then told the jury to decide whether the information upon which the expert relied was true and accurate, and ended by telling the jurors they may disregard any opinion they find unsupported by the evidence. CALCRIM No. 332 was given as part of the witness credibility instructions and does not imply application beyond the believability and credibility of the expert witness. It says nothing about the charges or allegations. In light of this, we reject defendant's contention that the instructions allowed the jury to consider the gang expert's basis testimony concerning defendant's prior offenses as substantive evidence that could be used to establish the gang enhancement mens rea elements or defendant's motive for shooting Sisoukchaleun.

### 3. Prejudice

As we have stated *ante*, the evidence against defendant establishing both his motive for the murder and the gang enhancement was very compelling. It is undisputed that defendant shot Sisoukchaleun twice, once at nearly point-blank range between the eyes and once at close range in the torso, killing him. The witness testimony established that the shooting was preceded by words amounting to a gang challenge. The primary issue at trial was whether defendant acted in self-defense. The witness testimony and surveillance video completely refuted defendant's claim of self-defense. Defendant denied being involved to the police and people he knew. Instead, he claimed his truck had been stolen and he never said anything about self-defense, even when talking on the phone to people he knew. Under any standard, the purported errors about which defendant complains were harmless.

### 4. Ineffective Assistance of Counsel

Defendant asserts that counsel was ineffective for failing to request a limiting instruction directing the jury that the evidence of his prior offenses on which the gang expert relied in forming his opinion was not to be considered for its truth. He complains that the failure to do so allowed the jury to consider the other crimes evidence for

42

purposes other than the "arguably proper purpose of explaining the basis of the expert's opinion concerning [defendant]'s gang affiliation."

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland, supra*, 466 U.S. at pp. 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367.) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

Where we may dispose of a party's ineffective assistance of counsel contention based on the lack of sufficient prejudice, we need not address the deficient performance prong. (*Carrasco, supra*, 59 Cal.4th at p. 982.) Here, we proceed directly to the prejudice prong. For the same reason we conclude that any error was harmless under any standard, we also conclude that defendant failed to establish the prejudice prong of his ineffective assistance of counsel claim. In light of the evidence discussed *ante*, as well as the instructions the trial court *did* give to the jury, we conclude that there is no reasonable probability that, had counsel requested a limiting instruction of the type defendant identifies here, defendant would have achieved a more favorable result. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 216-217.) Therefore, we conclude that defendant did not suffer prejudice as a result of any deficiency on trial counsel's part in failing to request such a limiting instruction.

### III. Mutual Combat/Initial Aggressor Instructions

Defendant contends there is a reasonable likelihood the jury interpreted the self-defense instructions related to mutual combat and initial aggressor status in a legally incorrect manner. He also contends there was insufficient evidence to support the instruction. We disagree.

## A. CALCRIM No. 3471 and Defendant's Contentions

CALCRIM No. 3471, as given by the trial court here, instructed, in pertinent part, that a "person who engages in *mutual combat or who starts a fight*,[16] has a right to self-defense only if, One, he actually and in good faith, tried to stop fighting. [¶] Two, he indicated by word or by conduct, to his opponent in a way that a reasonable person would understand, that he wanted to stop fighting, and that he had stopped fighting. [¶] Three, he gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense, if the opponent continued to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. [¶] That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (Italics added.)

Defendant contends that it is reasonably likely the jury interpreted the court's instruction on self-defense "in a legally incorrect manner that impaired [defendant]'s claim of self-defense and lowered the prosecution's burden of proof." Specifically, defendant claims that the jury could have interpreted the portion of CALCRIM No. 3471 that reads " '*who starts a fight*' " to mean starting a verbal argument or quarrel, as opposed to a physical fight. If the jury misinterpreted the instruction in this manner, then the jury could have concluded, contrary to law, that defendant had no right of self-defense because he initiated a verbal argument. Defendant also asserts that substantial evidence did not support the conclusion that he initiated a physical fight, and, therefore, that portion of the instruction should not have been given. According to defendant, by erroneously instructing the jury on self-defense, the court impaired his right to present a defense and lowered the prosecution's burden of proof.

---

[16] The language "engages in mutual combat" and "starts a fight" is optional in CALCRIM No. 3471. One term can be used without the other or the two terms can be used together.

## B. Analysis

### 1. Forfeiture

At trial, defendant did not request language to clarify the self-defense instruction. He also did not object to the proposed instruction. By failing to either object to the proposed instruction or request that clarifying language be added, defendant has forfeited his claim on appeal. (*People v. Valdez* (2004) 32 Cal.4th 73, 113 (*Valdez*).) We are not persuaded by defendant's argument in his reply brief that he did not forfeit his claim because the instruction given by the trial court contained an incorrect statement of law; CALCRIM No. 3471 as given was a correct statement of law. In any event, as we shall discuss, defendant's contentions fail on the merits.

### 2. Substantial Evidence Supporting the Instruction

As defendant notes, "instructions not supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross*); *People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) " 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case.' " (*Ross*, at p. 1050, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Defendant contends there was no evidence to support giving CALCRIM No. 3471.

There was substantial evidence that defendant and Sisoukchaleun exchanged gang-related fighting words near the entrance to Sunland. After obtaining his gun from his pickup, defendant then returned to sidewalk facing the crowd near the front of Sunland where he resumed and escalated his confrontation with Sisoukchaleun and his group. Sisoukchaleun removed his outer shirt, apparently believing the two would fight. According to Thammavongsa, as matters escalated and Sisoukchaleun took his shirt off, Sisoukchaleun said, " 'What's up? Let's fight. Let's fight.' " Defendant did not say anything in response. After walking around a person who tried to stop him, defendant followed Sisoukchaleun into the street. Sisoukchaleun took a swing at defendant, who dodged the blow. Defendant then shot Sisoukchaleun.

As the People assert, if defendant did not start the fight within the meaning of CALCRIM No. 3471, substantial evidence supports the premise that he engaged in mutual combat. "Evidence is '[s]ubstantial' . . . if it is 'sufficient to "deserve consideration by the jury," that is evidence that a reasonable jury could find persuasive.' " (*Ross, supra*, 155 Cal.App.4th at pp. 1050-1051.) It could be reasonably inferred from the evidence that "both combatants actually consented or intended to fight before the claimed occasion for self-defense arose." (*Id*. at p. 1047, italics omitted.) Thus, substantial evidence supported the instruction.

### 3. CALCRIM No. 3471

Defendant contends there is a reasonable probability the jurors interpreted the word "fight" in CALCRIM No. 3471 to be synonymous with the word "quarrel." " 'The meaning of instructions is no[t] . . . determined under a strict test of whether a "reasonable juror" *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312 (*Mathson*).) This review requires that we look not only at the challenged instruction, but also at the instructions as a whole in the context of the entire trial record. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 617.) " ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*Mathson*, at p. 1312.)

We first look to the other parts of CALCRIM No. 3471 and how the word "fight" is used therein. In context, it is unreasonable to read the word "fight" to mean an argument or verbal quarrel. The instruction lists three conditions when a person who engages in mutual combat or *starts a fight* has the right to use self-defense: "1. He actually and in good faith tried to *stop fighting*; [¶] 2. He *indicated*, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that *he*

46

*wanted to stop fighting* and that *he had stopped fighting*; [¶] AND [¶] 3. He gave his *opponent a chance to stop fighting*." (Italics added.) The instruction goes on to say: "If the defendant meets these requirements, he then had a right to self-defense if *the opponent continued to fight*." (Italics added.) The instruction further states that "[a] *fight* is mutual combat when it began or continued by mutual consent or agreement." (Italics added.) In context, these references to the word "fight" in CALCRIM No. 3471 must be understood to mean a physical fight. No reasonable juror could interpret the word "fight," as used here, to mean a verbal argument.

To test defendant's contention that "fight" could be read to mean "argument," we shall look at how the instruction would read if the word "argue" or a derivative thereof were substituted for the word "fight." This reveals the absurdity of defendant's argument. Substituting the word "fight" with "argue" or a derivative thereof, the instruction would list three conditions when a person who engages in mutual combat or *starts an argument* has the right to use self-defense: "1. He actually and in good faith tried to *stop* [*arguing*]; [¶] 2. He *indicated*, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that *he wanted to stop* [*arguing*], and that *he had stopped* [*arguing*]; [¶] AND [¶] 3. He gave his *opponent a chance to stop* [*arguing*]." (Italics added.) The instruction would then go on to read: "If the defendant meets these requirements, he then had a right to self-defense if *the opponent continued to* [*argue*]." (Italics added.) As for the definition of mutual combat in the instruction, substituting the word "fight" with "argument," mutual combat would essentially be defined: an "*argument*" is mutual combat when it began or continued because the parties agreed to "*argue*." This exercise demonstrates that the word "fight" as used in CALCRIM No. 3471 is obviously not synonymous with "argue" or a verbal quarrel.

Looking at the instructions as a whole, we next look to CALCRIM No. 3472. Whereas CALCRIM No. 3471 does not use the word "argue" or "quarrel" or speak to any such conduct, CALCRIM No. 3472 does use the word "quarrel," and it does so in a way

47

that conveys a different meaning than the word "fight." Per CALCRIM No. 3472, the trial court instructed the jury, "A person does not have the right to self-defense if he provokes a *fight or* a *quarrel* with the intent to create an excuse to use force." (Italics added.) The absence of the word "quarrel" in CALCRIM No. 3471 and the presence of that word in CALCRIM No. 3472 thus signals to reasonable jurors that the word "fight" does not mean an "argument" or "quarrel," and where reference to a verbal altercation is intended, the term "quarrel" is used separately from the word fight.

Indeed, CALCRIM No. 3472 demonstrates that provoking a "quarrel" or "fight" are *two* different acts of conduct. CALCRIM No. 3472 instructs that either or both acts could preclude a claim of self-defense if done with the intent to create an excuse to use force. *People v. Eulian* (2016) 247 Cal.App.4th 1324 (*Eulian*) provides an example of the applicability of the instruction in the context of a quarrel. The *Eulian* court held that CALCRIM No. 3472 was properly given under the facts of that case. (*Eulian*, at pp. 1332-1335.) In doing so, the court reasoned that the jury could have rationally concluded that the defendant had provoked the conflict, and that he continued his verbal aggression until the victim responded with physical force at which point the defendant used physical force, eventually rendering the victim unconscious by delivering a series of punches. (*Id.* at pp. 1328, 1334.)

The incident in *Eulian* began when the defendant started a quarrel. He walked up to the victim's vehicle to confront her about her practice of attracting feral cats by feeding them. During this initial part of the confrontation, the defendant screamed at the victim and jabbed his finger repeatedly toward her face. The victim leaned away, and eventually threw cat food in his direction. (*Eulian, supra*, 247 Cal.App.4th at pp. 1326, 1334.) The defendant tried to grab the victim's arm and pull her out of the vehicle, but lost his grip. (*Id*. at p. 1328.) The defendant continued to argue with the victim and gestured toward her, even as his mother tried to pull him away. (*Id*. at pp. 1328, 1334.) The victim slapped the defendant and then traded slaps with the defendant's mother. The

defendant then punched the victim twice, and at that same moment, the victim kicked at the defendant's mother. (*Id*. at p. 1328.) The defendant then yanked the victim out of the car and delivered two punches while she was on the ground, rendering her unconscious. (*Ibid*.) Thus, the defendant initiated a quarrel that escalated into a physical confrontation. The *Eulian* court held: "[a]ssuming defendant is correct that he and his mother were kicked by [the victim], if the jury determined that [the victim] did so in response to defendant's aggressive conduct, defendant did not have the right to use force to settle a physical confrontation he arguably created." (*Id.* at p. 1334.) The court held that the defendant's conduct provided a factual basis for CALCRIM No. 3472.[17] (*Eulian*, at p. 1334.)

Looking at the instructions as a whole and considering the absurd construction defendant advances of the word "fight" in CALCRIM No. 3471, we conclude that no reasonable juror would have interpreted the word "fight" in CALCRIM No. 3471 to be synonymous with the word "quarrel."

### 4. The Prosecutor's Arguments

Our review of the instruction includes an examination of the prosecutor's argument to the jury. (*Mathson, supra,* 210 Cal.App.4th at p. 1330.) The prosecutor did not misuse CALCRIM No. 3471 in closing argument or tell the jury that the conditions in CALCRIM No. 3471 could apply if the jurors concluded defendant simply started an argument or quarrel. Instead, the prosecutor properly argued the principle in CALCRIM No. 3472 that self-defense cannot be contrived by initiating a quarrel with the intent to create an excuse to use force and that self-defense is not available to a person who engages in mutual combat or starts a fight unless the three conditions are met. In discussing self-defense, the prosecutor told the jury: "Not available if you seek a quarrel

---

[17] As given, the instruction in *Eulian* was modified in a way not relevant here. (*Eulian, supra*, 247 Cal.App.4th at p. 1333.)

49

with the intent to create the necessity for self-defense. And not available to mutual combatants, unless you withdraw. [¶] If you start the fight, if this is mutual combat, you don't get self-defense unless you've satisfied those conditions, which we know didn't happen in this case." The prosecutor then argued: "[S]elf-defense is 100 percent reactionary, right? You can't contrive it. You can't set up the circumstances that then requires you to use self-defense, you can't start the quarrel. It has to be reactionary. And that was not the case here." Thus, the prosecutor said nothing in his argument to cause the confusion defendant claims results from the wording of CALCRIM No. 3471.

### 5. Conclusion

We conclude that defendant's claim of prejudicial error in connection with CALCRIM No. 3471 is without merit.

## IV. Antecedent Threats Instruction

Defendant asserts that the court's instruction on antecedent threats failed to inform the jury that a defendant who reasonably associated the victim with a prior shooting in which the defendant was wounded is justified in acting more quickly and with greater self-defense measures. He claims that he requested such an instruction, but the court failed to include the instruction. According to defendant, the instruction the court gave pertaining to this principle did not conform with the evidence presented to the jury. He further claims that, had an appropriate instruction been given, there is a reasonable probability that the jury would have acquitted him of murder.

We conclude that defendant forfeited this claim. In any event, we conclude that any error was harmless. We further conclude that defendant has failed to show he received constitutionally ineffective assistance of counsel.

### A. Additional Background

Defense counsel e-mailed the court and the prosecutor about adding certain language to CALCRIM No. 505 (Justifiable Homicide: Self-Defense or Defense of Another). Counsel wanted language added to that instruction to explain that one who has

been harmed or threatened by a group will be justified in acting more quickly and taking harsher measures for his or her own protection provided that the person reasonably associated the victim with that harm or threat.[18]

In a reply e-mail, the prosecutor opposed the addition as inapplicable to the circumstances of this case. Among other things, he noted that there was no evidence that defendant ever knew anyone in Sisoukchaleun's group. The prosecutor also emphasized that the incident when defendant was shot in the back, allegedly by a Crip, occurred 21 years prior to the events in this case.

The trial court included the following optional bracketed paragraphs in a draft of CALCRIM No. 505 for purposes of discussion with counsel. "[Someone who has been threatened or harmed by a person in the past, *is justified in acting more quickly or taking greater self-defense measures* against that person.] [¶] [If you find that the defendant received a threat from someone else that (he/she) reasonably associated with <insert name of decedent/victim>, you may consider that threat in deciding whether the defendant was justified in acting in (self-defense/ [or] defense of another).]" (See CALCRIM No. 505.)

At the instruction conference, the court asked defense counsel about her position on the instruction. Counsel asked the trial court to give the instruction she had e-mailed to the court based on the evidence indicating that defendant had been shot by a Crip when he was 15 years old, and the victim here having identified himself as a Crip.

---

[18] The proposed instruction in trial counsel's e-mail read as follows: "One who has been harmed by or received threats against [his] [her] life or person made by [a group] [or] [a person other than the victim] *is justified in acting more quickly and taking harsher measures* for [his] [her] own protection in the event of assault either actual or threatened, than would be a person who had not received such threats provided the person receiving the threats reasonably associated the victim with those threats." (Italics added.)

The prosecutor asserted that the jury should not be instructed with either paragraph, arguing that these instructions were not warranted based on the facts of this case. According to the prosecutor, the claim made by defendant on the jailhouse call that he was shot by a Crip when he was 15 could not justify this instruction, so many years later, simply because Sisoukchaleun identified himself as a Crip. The prosecutor asserted that this connection was too attenuated to warrant the instruction. Defense counsel countered that the shooting of defendant by a Crip when he was 15 was relevant to defendant's "feeling on that day when he's surrounded by people of a rival gang," and that these circumstances "should allow [defendant] to react more quickly than someone who hadn't been put through that."

The court expressed some reluctance about instructing the jury with these paragraphs from CALCRIM No. 505 because defendant had not received a *threat* from anyone. However, defense counsel convinced the court that, if a mere past threat from a particular group can be taken into consideration in assessing whether a defendant acted in self-defense, by even greater force of reason, the fact that one had actually been shot by a member of a particular group may be considered. The court was skeptical as to whether substantial evidence supported the "reasonably associated" portion of the instruction. The court stated that it was inclined to issue the second bracketed paragraph, but not the first.

The following colloquy then took place:

"[DEFENSE COUNSEL]: But not the one above it?

"THE COURT: Yeah, it doesn't seem to make sense. I guess someone who has been threatened --

"[DEFENSE COUNSEL]: And that's fine. I'm not asking for the one above it. I want the second paragraph."

All agreed to the instruction. As given, the instruction did not include the principle that having been harmed in the past by someone reasonably associated the

52

victim, a person is *justified in acting more quickly or taking greater self-defense measures*.[19]

In closing argument, defense counsel argued self-defense, telling the jury: "one of the most important things, too, you can look at is, if you find the defendant received a threat from someone else that he reasonably associated with the victim, you may consider that threat in deciding whether the defendant was justified." She then went on to talk about the evidence establishing that defendant had been shot by Crips when he was 15

---

[19] The court instructed the jury with CALCRIM No. 505 as follows: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if, Number One, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury. [¶] Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] And Three, the defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed that there was imminent danger of death or great bodily injury to himself. [¶] Defendant's belief must have been reasonable, and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. [¶] If the defendant used more force than was reasonable, the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all of the circumstances as they were known to and appeared to the defendant, and consider whether a reasonable person in a similar situation with similar knowledge would have believed. [¶] If the defendant's beliefs were reasonable, the danger does not have to actually exist yet. [¶] *If you find that the defendant received a threat from someone else that he reasonably associated with the victim/decedent, you may consider that threat in deciding whether the defendant was justified in acting in self defense*. [¶] A defendant is not required to retreat. He is entitled to stand his ground and defend himself. And if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. [¶] This is so, even if safety could have been achieved by retreating. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter." (CALCRIM No. 505, as given, italics added.)

53

and asserted that when defendant shot Sisoukchaleun, there were five guys associated with Sisoukchaleun standing around defendant.

## B. Forfeiture

On appeal defendant does not argue that the specific language in the omitted optional paragraph of CALCRIM No. 505 should have been given. Rather, he asserts that the instruction given should have included similar language, to the effect that defendant would have been justified in acting more quickly or taking greater self-defense measures based on prior threats or harm reasonably associated with the victim. However, defendant acquiesced to the omission of nearly identical language to that which he now claims should have issued.

Defendant forfeited his claim. The failure to either object to the proposed jury instruction or request the language defendant suggests on appeal forfeits the claim that such language should have been included in the instruction. (*Valdez, supra*, 32 Cal.4th at p. 113.) Following the e-mail exchange between the attorneys and the court, at the instruction conference, defense counsel did not object to the CALCRIM No. 505 instruction to be given to the jury. In her e-mail, defense counsel had requested the addition of the language similar to the optional bracketed language in CALCRIM No. 505. However, at the instruction conference, defense counsel: (1) acquiesced in the omission of the paragraph of CALCRIM No. 505 containing the "acting more quickly or taking greater self-defense measures" language; (2) did not reaffirm her desire for the language proposed in her e-mail; and (3) consented to the CALCRIM No. 505 instruction as given. Having agreed to the instruction and having abandoned the request for additional language, defendant forfeited his claim on appeal that the jury should have been instructed with the language proposed by defense counsel in her pre-conference e-mail.

## C. Harmless Error

In any event, we conclude that, on this record, there is no reasonable probability that a different result would have been obtained had the jury been instructed on self-defense with the additional language proposed by defendant pertaining to antecedent threats. (*People v. Watson* (1956) 46 Cal.2d 818, 835-836 (*Watson*).) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

The trial court instructed the jury extensively on self-defense. The trial court specifically instructed the jury: "If you find that the defendant received a threat from someone else that he reasonably associated with the victim/decedent, you may consider that threat in deciding whether the defendant was justified in acting in self defense." Thus, the jury rejected the claim that defendant acted in self-defense based on a threat—his previously being shot by a Crip gang member—that he reasonably associated with Sisoukchaleun.

As we have indicated, the evidence here overwhelmingly showed that defendant did not act in self-defense. There is no evidence that Sisoukchaleun did anything more threatening than taking off his shirt in preparation to engage defendant in a mutual fight. Defendant ignored a person who appeared to try to get him to disengage, followed Sisoukchaleun into the street, and, instead of fighting, after Sisoukchaleun took one wild swing, shot Sisoukchaleun in the face at nearly point-blank range with a gun he had retrieved from his vehicle moments before. Given this evidence and the other evidence we have recounted, there is no reasonable probability that defendant would have obtained

55

a more favorable outcome had the jury also been instructed that one who has been harmed by or received threats from a group will be justified in acting more quickly and taking harsher measures for his own protection provided that he reasonably associated the victim with that group. This is so because under the circumstances here, defendant was not reasonably justified in shooting Sisoukchaleun in the face and then again in the side of his torso, even though he had been shot by some unspecified Crip gang when he was a "youngster."

### D. Ineffective Assistance of Counsel Claim

To the extent counsel's performance was deficient for failing to request the instruction, defendant did not suffer any prejudice. For the same reasons we have concluded any error is harmless, it is not reasonably probable that, had the instruction now advocated been given, defendant would have obtained a more favorable outcome. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 216-217; see *People v. Xiong* (2020) 54 Cal.App.5th 1046, 1068, fn. 11 [*Watson* standard for harmless error is essentially the same as the prejudice prong of *Strickland*]; *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [same].)

### V. Instruction on Viewing Testimony about Defendant's Non-recorded Statements with Caution

Defendant asserts that the trial court erred in failing to instruct with the bracketed paragraph in CALCRIM No. 358 (Evidence of Defendant's Statements). That portion of the instruction essentially tells jurors to view a defendant's non-recorded oral statements with caution. Defendant raises this claim in connection with his statements concerning the Bloods about which Vue and Thammavongsa testified. Defendant asserts that the court's failure to give this portion of the instruction was prejudicial because there was a reasonable probability that, had the jurors been instructed to view these unrecorded statements with caution, the jury would have found him not guilty of murder. The People assert that any error was harmless. We agree with the People.

The court instructed the jury with CALCRIM No. 358, as follows: "You have heard evidence that the defendant made oral statements before the trial. You must decide whether the defendant made any of these statements in whole or in part. If you decide the defendant made such statements, consider the statements along with all of the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statement." (CALCRIM No. 358, as given.) The court did not instruct the jury with the bracketed paragraph which reads: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."

"The extrajudicial admission of a party—that is, any statement by a party to an action that is offered against that party—is admissible in evidence regardless of its hearsay character. [Citations.] 'This kind of testimony is considered dangerous, first, because it may be misapprehended by the person who hears it; secondly, it may not be well remembered; thirdly, it may not be correctly repeated.' [Citation.] Even witnesses with the best intentions often cannot report the ' "exact language" ' used by a defendant, and therefore may convey, through errors and omissions, an inaccurate impression of a defendant's statements. [Citation.] ' "No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself." [Citation.]' [Citation.] Even if the party testifies, it may be difficult to convincingly dispute evidence of an extrajudicial admission because the party has an obvious interest in the outcome of a case. 'It was undoubtedly such considerations that led the Legislature to make the admitting of extrajudicial admissions into evidence conditional on the giving of a cautionary instruction.' [Citation.] The cautionary instruction 'is designed to aid the jury in determining whether an admission or confession was in fact made.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1185 (*Diaz*).)

57

Prior to *Diaz*, trial courts had a duty to provide the cautionary instruction, first under statute, and following the repeal of the statute, based on case law.[20] (*Diaz, supra*, 60 Cal.4th at pp. 1188-1190.) However, in *Diaz*, our high court concluded that, "in light of a change in the law that requires the general instructions on witness credibility to be given sua sponte in every case, the cautionary instruction is not one of the general principles of law upon which a court is required to instruct the jury in the absence of a request." (*Id*. at p. 1189.) The *Diaz* court expressly declined to determine, however, whether the elimination of the sua sponte obligation applied retroactively because it determined that, in the case before it, any error in omitting the cautionary instruction was harmless. (*Id.* at p. 1195; see also *People v. Brooks* (2017) 3 Cal.5th 1, 80 (*Brooks*).)

We likewise conclude that, whether the elimination of the sua sponte obligation to provide the cautionary instruction applies retroactively or not, any error in the omission of that instruction here was harmless as there is no reasonable probability that the jury would have reached a result more favorable to defendant had the instruction been given. (*Diaz, supra*, 60 Cal.4th at p. 1195; *Watson, supra*, 46 Cal.2d at pp. 835-836.) "[T]he purpose of the cautionary instruction is to assist the jury in determining whether the defendant actually made the statement attributed to him." (*Brooks, supra*, 3 Cal.5th at p. 80.) " 'Since the cautionary instruction is intended to help the jury to determine

---

[20] In pertinent part, the former statute read: " 'the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of a party with caution.' " (*Diaz, supra*, 60 Cal.4th at p. 1184, citing former Code Civ. Proc., § 2061, subd. 4.) The portion of the statement related to oral admissions of a party was repealed with the adoption of the Evidence Code. (*Diaz*, at p. 1184.) The Law Revision Commission explained that because " 'the section is but a partial codification of the common law, the repeal should have no effect on the giving of the instructions contained in the section or on the giving of any other cautionary instructions that are permitted or required to be given by decisional law,' " and the California Supreme Court so held in subsequent case law (*id*. at pp. 1184-1185), but later took another look at this issue in *Diaz*.

whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the [statements] were repeated accurately.' " (*Diaz*, at p. 1195, quoting *People v. Pensinger* (1991) 52 Cal.3d 1210, 1268 (*Pensinger*).)

Again, the unrecorded statements at issue here are statements about which Vue and Thammavongsa testified in which defendant essentially broadcast his status as a member of the Meadowview Bloods and which could be interpreted as a gang challenge. According to Vue, an African-American male responded to Thammavongsa's statement that he wanted to race and his use of the term "cuz" by saying: " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' " Vue also testified that the man said, " 'I am a Blood.' " According to Thammavongsa, after he and Sisoukchaleun both said the word, " 'cuz' " in their conversation, defendant said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' "

Contrary to defendant's contentions, there is no conflict of any significance in the evidence concerning the exact words used, their meaning, or whether they were repeated accurately. (See generally *Diaz, supra*, 60 Cal.4th at p. 1195; *Pensinger, supra*, 52 Cal.3d at p. 1268.) It is true that Vue and Thammavongsa did not testify to hearing exactly the same words. However, the meaning of the words they each heard, which were substantially similar, was clear: defendant was identifying himself as a Blood gang member. And the evidence does not suggest the witnesses made up defendant's invocation of the Meadowview Bloods. There was no apparent way these witnesses would know defendant was associated with the Meadowview Bloods other than by his own statements. In the video, it is clear defendant is wearing a jacket, so the tattoo on his arm could not have been visible. Moreover, on this record, it is possible that these two witnesses in fact heard different statements by defendant; Vue walked away from the confrontation shortly after it began, while Thammavongsa remained nearby throughout,

59

and, after some time, Sisoukchaleun "got tired of hearing" defendant say "Blood, Meadowview . . . ."

Defendant does argue on appeal that Vue's testimony raised a conflict as to whether it was he who spoke the words at issue. When viewing the video recording during her direct testimony, Vue initially identified a different African-American individual as the one who made the statements at issue here and who then became involved in a confrontation with Sisoukchaleun. Vue's initial confusion appears to have resulted from the fact that she had not seen the video recording prior to testifying. However, her description of the man involved in the altercation with Sisoukchaleun and the clothes he was wearing matched that of defendant, including the defendant's pants which were adorned with a red design. And Vue identified defendant in a photographic lineup as the person in question. In any event, this issue does not amount to a conflict in the evidence as to the words used, their meaning, or whether they were reported accurately. Rather, this is the functional equivalent of a denial by defendant that he was indeed the one who made the statements now attributed to him. As the People observe, where there is "simply a denial by the defendant that he made the statements attributed to him, [the California Supreme Court] ha[s] found failure to give the cautionary instruction harmless." (*People v. Dickey* (2005) 35 Cal.4th 884, 906, citing *People v. Bunyard* (1988) 45 Cal.3d 1189, 1225-1226 (*Bunyard*).)

Defendant asserts on appeal that, to the extent that he made the statements, he was trying to avert a conflict "by trying to ingratiate himself with the approaching young men, who he assumed were Blood gang members," or he made the statements in a last ditch effort to make the youths "back off," which could be consistent with a theory of self-defense.

First, inasmuch as the statements were relevant to defendant's gang membership, whether the statements were made in a hostile, aggressive manner or in a defensive manner is immaterial as to the issue of whether the bracketed portion of CALCRIM

60

No. 358 should have been given. Second, with regard to defendant's intent and self-defense claim, we conclude that it is not reasonably probable that the jury would have reached a result more favorable to him had the court given the cautionary instruction. (See generally *Diaz, supra*, 60 Cal.4th at p. 1195; *Watson, supra*, 46 Cal.2d at pp. 835-836.)

As the People observe, and as our high court relied upon in finding harmless error in *Diaz*, the jury here was charged with CALCRIM No. 226, "which sets out the numerous factors the jury may consider in deciding whether a witness's testimony is credible." (*Diaz, supra*, 60 Cal.4th at p. 1196.) Those factors included, among other things, "how well a witness could 'see, hear, or otherwise perceive the things about which the witness testified,' how well the witness was 'able to remember and describe what happened,' and whether the witness's testimony was influenced by 'bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided.' " (*Id*. at p. 1191.) " '[W]hen the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, [the California Supreme Court] ha[s] concluded the jury was adequately warned to view their testimony with caution.' " (*Ibid*., quoting *People v. McKinnon* (2011) 52 Cal.4th 610, 680.) Additionally, we note that the portion of CALCRIM No. 358 that was given to the jury specifically instructed: "You must decide whether the defendant made any of these statements in whole or in part. If you decide the defendant made such statements, consider the statements along with all of the other evidence in reaching your verdict." Thus, the jury was on notice to first determine whether defendant made the statements and to do so considering the aforementioned credibility factors. Moreover, beyond the combined impact of the instructions, the jury had the opportunity to assess defendant's intent and state of mind in hearing the testimony of the witnesses and observing his actions on the surveillance video.

61

Defendant relies principally on *People v. Ford* (1964) 60 Cal.2d 772, 799-800 (*Ford*), a case in which the California Supreme Court determined that the failure to give the cautionary instruction was prejudicial error. We note that, in *Ford*, the trial court had the obligation under statute (see fn. 20, *ante*) to give the instruction, a factor that undoubtedly led to the reversal. (*Id.* at p. 799.) In *Ford*, before the shooting the defendant said that "he 'needed the drink to get up his courage,' " and made pre-offense threats, including " 'they'd better not give me any trouble or they are going to lose' " and " 'that son-of-a-bitch had better not give me any trouble.' " (*Ibid.*) After shooting the victim, the defendant was heard to say, " 'that will be the end of you, you mother-fucker.' " (*Ibid.*) These statements, the *Ford* court observed, "bore *directly* on the issue of [the] defendant's capacity to deliberate and premeditate sufficiently to commit first degree murder." (*Id.* at pp. 799-800, italics added.) Additionally, the statements were reported by witnesses undeniably hostile to the defendant's case, and, perhaps more significantly, whose testimony was conflicting and inconsistent. (*Id.* at p. 800.)

Here, similar to *Ford*, the statements attributed to defendant were important to prove defendant's mental state and motive. Additionally, Thammavongsa, Sisoukchaleun's cousin and a self-acknowledged affiliate of LGC, could certainly be deemed hostile to defendant's cause. However, Vue was not a similarly hostile witness. She had only met Sisoukchaleun and his group that night. Further, contrary to defendant's contention, and unlike in *Ford*, Vue's and Thammavongsa's testimony did not "show[] a number of obvious conflicts and apparent inconsistencies." (*Ford, supra,* 60 Cal.2d at p. 800.) In substance, their testimony was in agreement in that it showed that defendant invoked the name of the Bloods. Furthermore, defendant's gang affiliation was before the jury through other evidence, including defendant's tattoo and the jail phone calls interpreted by the prosecution's gang expert.

We " 'focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.' " (*Beltran, supra*, 56

Cal.4th at p. 956.) Based on all of the foregoing, we conclude that, even if the trial court erred in failing to give the cautionary instruction, it is not reasonably probable that the jury would have reached a result more favorable to defendant had it been so instructed. (See generally *Diaz, supra*, 60 Cal.4th at p. 1195; *Beltran*, at p. 956; *Watson, supra*, 46 Cal.2d at pp. 835-836.)

## VI.  Prosecutorial Misconduct Claims

Defendant asserts that the prosecutor's purported misconduct violated his right to due process.  While acknowledging that his trial counsel did not object to any of the remarks now claimed to constitute misconduct, defendant:  (1) asserts that trial counsel's conduct was constitutionally ineffective (a contention we address in part VII of the Discussion, *post*), and (2) encourages us to exercise our discretion to reach the merits of his unpreserved claims.  Defendant has forfeited his claims.  In any event, we conclude defendant's claims are either meritless or did not result in prejudice.

### A.  Standard of Review

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.  [Citation.]  In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He [or she] has the right to fully state his [or her] views as to what the evidence shows and to urge whatever conclusions he [or she] deems proper." (*People v. Lewis* (1990) 50

63

Cal.3d 262, 283.)  To prevail on a claim of prosecutorial misconduct in closing argument, the defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner.  (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).)

## B. Forfeiture

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)  Here, as defendant acknowledges, his trial counsel did not object or request an admonition at any time during the prosecutor's closing argument.  Defendant has thus forfeited these claims. (*People v. Dykes* (2009) 46 Cal.4th 731, 757, citing *People v. Stanley* (2006) 39 Cal.4th 913, 952.)  In any event, we will address the merits of defendant's contentions since he raises them in connection with his claim of ineffective assistance of counsel.

## C. Analysis

### 1. The Prosecutor's Reference to Information the Trial Court Would Have at Sentencing

Defendant points out that during his initial closing argument, the prosecutor stated that, if defendant was convicted, the judge at sentencing would have "a lot more information than" the jury, and that the court would have "all kinds of information that" the jury did not have.  According to defendant, this constituted an improper reference to matters outside of the record.

Before addressing this contention, we take a moment to put the prosecutor's comments in context.  The comments were an apparent effort to remind the jury to make their decision independent of penalty or punishment.  The prosecutor said, "And as I talked about a little bit in my questioning of you originally, it's not about penalty and

punishment. Okay. You have to absolutely just decide what happened in the case, decide what the act was, what the defendant specifically did, what his mental state was at the time that he did it. And you have to trust that this Judge can do what he needs do to, [*sic*] and do his job in terms of penalty and punishment. [¶] *Understanding that in making those decisions, he will have a lot more information than you do.* [¶] Okay. He *will have all kinds of information that you don't have, so you cannot make that decision from the jury deliberation room.* [¶] Okay. So you have to let him make the decision as to penalty and punishment. You guys just make the decision as to the law and the facts." (Italics added.) In context, it appears that the prosecutor's comments related to information the judge would have at sentencing, not information the jury did not have relative to determining the facts in the case.

As a general matter, "[a] prosecutor commits misconduct by referring in argument to matters outside the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026 (*Cunningham*).) Where prosecutorial misconduct occurs, reversal is not required unless there is prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 161; *People v. Castillo* (2008) 168 Cal.App.4th 364, 386-387 (*Castillo*).) Unless a prosecutor's misconduct renders the trial fundamentally unfair, misconduct warrants reversal only if it is reasonably probable that the defendant would have obtained a more favorable result absent the misconduct. (*Castillo*, at pp. 386-387 & fn. 9.)

Here, the trial court instructed the jury at the beginning of the trial and again at the end, pursuant to CALCRIM No. 222, that the statements of counsel are not evidence. The jurors were also instructed pursuant to CALCRIM No. 200 that they were to decide the case based solely on the evidence presented, and pursuant to CALCRIM No. 3550 that they were not consider punishment in arriving at their verdict. We presume the jury followed these instructions. (*Letner and Tobin, supra*, 50 Cal.4th at p. 196.) We do not condone the prosecutor's remarks. Although the remarks related to information the judge would have at sentencing, they were unnecessary to describe the jury's duty to make their

65

decision independent of penalty and punishment and ultimately supplied defendant with the argument he makes on appeal. Nevertheless, given the strength of the evidence in the case, the instructions provided to the jury, and the context in which these statements were made, we conclude it was not reasonably probable that, had the prosecutor not made these remarks, defendant would have obtained a more favorable result.

## 2. Discussion about the Driver of the Pickup Who Did Not Testify

Defendant claims the prosecutor committed misconduct in discussing the fact that the woman who drove him away from the scene in his pickup was not called to testify.[21]

During his closing argument, the prosecutor stated, "Now, I bet you anything that you guys are sitting here going, Wait a minute, where is the woman who's the driver of the truck, right? I mean, she's the getaway driver. She was right there driving the truck. Why didn't she come in and sit up here and testify in this case, right? Why didn't the getaway driver testify in this case? [¶] Okay. The law says, obviously, that you don't have to call all witnesses to any particular -- in any particular crime. You have to trust to some extent that if somebody had something to say that's going to impact this case, one way or the other, myself or [defense counsel] would have called them and brought them in here to testify. [¶] Okay. And if, when this trial is over, you're released from your admonition, you want to ask those questions, I would be happy to answer them for you. If you want to ask me why didn't Catina Barker testify when this trial is over and done with, when you're released from the admonition not to talk about this case, I would be happy to talk to you about it, but right here, as we sit here today, the only thing that's

---

[21] The trial court did not give CALCRIM No. 373 to the jury. That instruction reads: "The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether (that other person has/those other persons have) been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged."

relevant is the witnesses that did testify and what they had to say and what evidence they produced in this case, okay. [¶] So you can't speculate about what someone else would have or might have said had they been here, okay? You just have to trust that the lawyers in this case, that we have put on the evidence in this case that is relevant to this case, and that will assist you as the triers of fact in making the decisions that you have to make in this case."

Defendant contends this line of discussion improperly implied that the prosecutor had knowledge of facts not in evidence. In support of this contention, defendant relies on *People v. Hall* (2000) 82 Cal.App.4th 813 (*Hall*). In *Hall*, the defense counsel, in closing argument, emphasized the fact that Officer Tinsley, one of two arresting officers, was not called by the prosecution to testify, although the prosecution did present the testimony of the other arresting officer, Officer Williams. (*Id.* at p. 816.) In rebuttal, the prosecutor observed that the defense could have called Officer Tinsley to testify. (*Ibid.*) The prosecutor then stated that, had he called Officer Tinsley, his testimony would have been repetitive. (*Ibid.*) On appeal, the *Hall* court held that the prosecutor's argument that the defense could have called Officer Tinsley was proper. (*Id.* at p. 817.) However, the court explained: "the prosecutor went too far when he told the jury the absent witness's testimony would have been repetitive. The effect of this argument was to tell the jury that the witness, if called, would have testified exactly as Officer Williams did, in a manner favorable to the prosecution. This was misconduct." (*Ibid.*) The court added, "[t]he prosecutor, in the guise of closing argument, told the jury what the testimony of an uncalled witness would have been, thus implying that he decided not to call Officer Tinsley as a witness after determining that his testimony would have been the same as and corroborative of Officer Williams's testimony." (*Ibid.*) The *Hall* court held that this denied the defendant his Sixth Amendment rights to confront and cross-examine an uncalled prosecution witness. (*Hall*, at p. 817.)

Here, the prosecutor's remarks did not cross this line. Crucially, the prosecutor did not make any representations, express or implied, as to how Barker would have testified. He did not state that her testimony would have been repetitive with that of the other prosecution witnesses. Rather, he stated that the jurors should "trust to some extent that if somebody had something to say that's going to impact this case, one way or the other, myself or [defense counsel] would have called them and brought them in here to testify." This remark was, essentially, content-neutral. In other words, the prosecutor did not impermissibly tell the jury what Barker's testimony would have been, "thus implying that he decided not to call [Barker] as a witness after determining that [her] testimony would have been the same as and corroborative of" the testimony of other prosecution witnesses. (*Hall, supra*, 82 Cal.App.4th at p. 817.)

Accordingly, we reject defendant's contention that the remarks constituted prosecutorial misconduct and deprived him of his Sixth Amendment rights to confrontation and cross-examination.

### 3. Weena Vue's Testimony

Defendant correctly observes that while Vue did not testify that she heard him say "Meadowview," the prosecutor in closing stated, "Remember, Weena Vue said that the defendant responded, 'This is Meadowview,' and he started to get angry?" Thus, the prosecutor misstated that Vue testified she heard defendant say something about Meadowview.

Defendant is correct that "mischaracterizing the evidence is misconduct." (*Hill, supra*, 17 Cal.4th at p. 823.) However, defendant suffered no prejudice from this mischaracterization.

While Vue did not specifically testify that defendant said anything about Meadowview, she did testify that the man who was involved in the confrontation with Sisoukchaleun said, " 'I am a Blood.' " She also testified to hearing the statement: " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood

68

all the way.' " Sisoukchaleun responded, " 'Yeah, this is LAC, Little Asian Crip.' " According to Vue, although the conversation had not been confrontational initially, at that time, the African-American man "got into Bud's face," and the two men started behaving more aggressively towards each other.

It is not disputed that, as the gang expert testified, Meadowview Bloods are a subset of the Bloods criminal street gang. While Vue did not testify that defendant identified himself as a Meadowview Blood, the words she said she heard indicated that defendant was affiliated with the Bloods, and it is undisputed that defendant shot and killed Sisoukchaleun. Additionally, as the People observe, there was evidence before the jury from Thammavongsa that defendant said he was a Meadowview Blood. Thus, the jury heard testimony from another witness that defendant identified himself more specifically as a Meadowview Blood. Moreover, as we have noted, there was no apparent way these witnesses would know defendant was associated with a Blood gang other than by his own statements. Consequently, even though the prosecutor misstated Vue's precise testimony, defendant suffered no prejudice as a result.

To the extent defendant argues that the prosecutor committed misconduct by misrepresenting Vue's testimony as indicating that defendant was confrontational and combative immediately, rather than becoming so only after Sisoukchaleun responded to his remark, defendant's contention is without merit. The prosecutor's remark was not an outright mischaracterization of Vue's testimony, and the jury was properly instructed that it must decide the case solely based on the evidence, and the attorney's remarks were not evidence.

### 4. "Leave it Alone"

In his opening statement at the beginning of the trial, the prosecutor told jurors, "witnesses also tell you that an individual who appears to know the defendant tries to get him to calm down and says, 'Hey, leave it alone, leave it alone.' " The prosecutor reprised this assertion in closing arguments. However, as defendant correctly observes,

there was no testimony that any individual told defendant to " 'leave it alone.' " To the extent that the prosecutor's remark constituted a mischaracterization of the evidence and misconduct, defendant suffered no prejudice as a result.

While there was no testimony of this sort, our independent viewing of the surveillance video demonstrates that, as the confrontation escalated, an unidentified African-American man walked towards the group with his arm outstretched, placed his arm over defendant's chest and appeared to talk with defendant. The man appears to attempt to restrain defendant or encourage restraint. Moreover, again, the jury was instructed that it must decide the case solely based on the evidence, and the attorney's remarks were not evidence. In light of this evidence and the court's instructions, defendant suffered no prejudice from the prosecutor's comments.

### 5. Burden of Proof and *Griffin*[22] Error Claim

Defendant contends the prosecutor misstated the law by arguing that reasonable doubt had to be based on " 'some evidence.' " According to defendant, the prosecutor suggested that defendant had a burden to present " 'some evidence' " of what he actually believed relative to the need to defend himself to support his claim of imperfect self-defense.

The prosecutor stated in his closing argument: "The term that we use in the law in this country is 'beyond a reasonable doubt.' And the idea here is that it has a couple of components to it. First of all, it's reasonable and doubt. The idea that it could be open to any doubt is not what the law is. And the jury instruction that the judge read to you, talks about the fact that it's not speculation or possible doubt, because everything in life is open to some possible or imaginary doubt." The prosecutor continued: "So the idea here is that any reasonable doubt you have, would have to be based on the evidence in this

---

[22] *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110] (*Griffin*).

case, have to be based on something you heard in this courtroom, something that came from a witness in this chair, a piece of evidence that you received in the trial. The idea would have to be -- that it would have to come from the evidence, not speculation, not a possible doubt, but something from the evidence in this case."

In discussing the concept of imperfect self-defense, the prosecutor stated: "Basically, what it tells us is that a reasonable person would not have believed in the need for self-defense, but the defendant, he did. Here's the problem with that. That particular offense [*sic*] requires an actual -- an actual belief, proof of an actual belief, that the defendant believed that. There is no evidence of what the defendant actually believed. [¶] Okay. We don't have that. [¶] Remember, when we look at the evidence in this case, we make decisions. We only look at the evidence in the case. We don't make -- we don't speculate. We don't have conjecture. We look at the evidence. There's no evidence of that."

Defendant again relies on *Hill, supra*, 17 Cal.4th 800, in which the prosecutor, discussing the reasonable doubt standard, stated: " 'it must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. There has to be some evidence on which to base a doubt.' " (*Id.* at p. 831, italics omitted.) After the court overruled defense counsel's objection, the prosecutor in *Hill* continued: " 'There must be some evidence from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' " (*Ibid.*, italics omitted.) The *Hill* court stated, "to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence." (*Ibid.*) However, the court also observed that, "On the other hand, [the prosecutor] may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind." (*Ibid.*) Ultimately, the court concluded that the prosecutor committed misconduct "insofar as her statements could reasonably be interpreted as suggesting to

71

the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt." (*Ibid.*) While the court characterized the matter as an arguably close question, the court concluded that it was "reasonably likely [the prosecutor]'s comments, taken in context, were understood by the jury to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id.* at p. 832.)

Here, as the People observe and defendant concedes, the prosecutor did not state that reasonable doubt must be based on " 'some evidence.' " We conclude that the prosecutor here did not commit misconduct by shifting the burden of proof or suggesting that defendant was required to present some evidence or meet some evidentiary threshold. The prosecutor simply told the jury there was no proof of defendant's actual belief regarding the need to defend himself and that in deciding the case, the jury must not speculate about that. Thus, the essence of the prosecutor's remarks was that the jury must make its determinations based on the evidence presented at trial, a legally correct observation. Reasonable doubt, stated by the prosecutor, must arise from the evidence— whether based on what the evidence proved or what it failed to prove—rather than speculation or conjecture.

This case has even less in common with *People v. Woods* (2006) 146 Cal.App.4th 106, another case upon which defendant relies. In *Woods*, the prosecutor, during her rebuttal addressing the defense's attack on a police officer's account of the relevant events, stated: " 'Officer Campbell has a job to do. He has been doing that job for many, many years. [Defense counsel] didn't bring one witness into this courtroom to say that he doesn't do it properly. That he does it in a poor manner, that he does it wrong. That he tramples on anybody's rights. Not one witness came into court to say that but she thinks it's okay for her to stand up here in front of you and say that and that you should take it as gospel. No, she is obligated to put the evidence on from that witness stand.' " (*Id.* at p. 112.) These remarks, clearly misstating the law in claiming that the defendant "bore

72

some burden of proof or persuasion," were plainly improper and constituted misconduct. (*Id*. at p. 113.) There are no remarks of a similar character here.

Defendant asserts that the prosecutor's comments focused the jury's attention on the fact that defendant did not testify and "suggested that his failure to tell the jury what he actually believed foreclosed his claim of imperfect self-defense." Defendant contends that because he was the only one who could provide testimony as to what he actually believed, the prosecutor comments violated *Griffin, supra*, 380 U.S. at page 615. On this point he relies, without analysis, on *People v. Murtishaw* (1981) 29 Cal.3d 733, 757 and footnote 19 (*Murtishaw*), and *People v. Bradford* (1997) 15 Cal.4th 1229, 1339 (*Bradford*). Citing its earlier decision in *Murtishaw*, our high court held in *Bradford* that a prosecutor commits *Griffin* error "if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Bradford*, at p. 1339.) However, the *Bradford* court also noted, that *Griffin* does not extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence. (*Bradford*, at p. 1339.) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Id.* at p. 1340.) "*Griffin*['s] . . . protection of the right to remain silent is a 'shield,' not a 'sword' that can be used to 'cut off the prosecution's "fair response" to the evidence or argument of the defendant.' " (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257.)

In *Murtishaw*, the prosecutor referred to a witness's testimony about pre-offense statements the defendant had made as "uncontradicted." (*Murtishaw, supra*, 29 Cal.3d at p. 757 & fn. 19.) However, on appeal, the court did not address the merits, and simply held that defendant forfeited the argument by failing to object in the trial court. (*Id*. at pp. 757-758.)

In *Bradford*, the prosecutor argued the victims had been killed for pleasure and there was no evidence to contrary. (*Bradford, supra*, 15 Cal.4th at p. 1338.) The prosecutor further argued that the defense presented no evidence regarding a blood stain in defendant's vehicle or evidence contradicting the time of death established by the coroner, and presented no alibi witnesses or photographs to prove where he was. (*Id*. at p. 1339.) These comments were not improper. (*Ibid*.)

In the instant case, the prosecutor did not say or even imply defendant was the only source of evidence as to his actual belief; nor did the prosecutor even comment about the failure to call witnesses. And as defendant concedes, a defendant's state of mind may be inferred from sources other than defendant. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824.) Consequently, defendant was not the only source of evidence establishing his actual belief in the need to defend himself. Here, the prosecutor merely commented on the state of the evidence in that the evidence before the jury did not demonstrate that defendant actually believed in the need for self-defense.

These comments did not amount to prosecutorial misconduct.

**6. Heat of Passion**

Defendant asserts that the prosecutor misstated the law with regard to heat of passion which may serve to reduce murder to manslaughter. According to defendant, the prosecutor's remarks erroneously conveyed to the jury that defendant's specific *conduct of killing* the victim in response to the provocation must be reasonable. On this point, we agree with defendant.

In *Beltran, supra*, 56 Cal.4th 935, the California Supreme Court discussed the history of heat of passion and rejected the People's assertion that the heat of passion standard should require a showing that the provocation must be of a kind that would cause an ordinary person of average disposition to kill. Our high court reaffirmed the proper standard to be applied: "when examining heat of passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at

74

the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Id.* at pp. 938-939, quoting *People v. Logan* (1917) 175 Cal. 45, 49.)  The *Beltran* court further clarified that "[a]dopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing." (*Beltran*, at p. 949.)  The court continued:  "The proper focus is placed on the defendant's state of mind, not on his particular act.  To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.  Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his reason and judgment obscured." (*Ibid.*)

Here, the prosecutor stated in closing arguments:  "Sudden quarrel and heat of passion. . . .  The definition is that the defendant was provoked.  He acted rashly with intense emotion that obscured reasoning and judgment.  [¶]  Here's the kicker.  *A reasonable person would have acted the same way*.  [¶]  Okay.  There is no such thing as a reasonable gangster standard.  You heard that the defendant cannot set up his own standard of reasonableness.  This is a reasonable person standard.  It is a community standard." (Italics added.)  After furnishing an example of provocation, the prosecutor continued, "Okay.  So on that concept of reasonableness -- we know, from listening to this case, that there is no way that we can place the defendant in that scenario.  *There is no conceivable way that the defendant's actions mirror what we understand as sudden quarrel, heat of passion*.  There is no reasonableness standard for what he did.  *As a community, we do not look at his conduct and say, That's reasonable, Mr. Blessett*.  That's not murder.  That's just manslaughter . . . ." (Italics added.)  Later, the prosecutor

75

stated: "The victim takes one .28 blood alcohol swing at the defendant. The evidence in this case, uncontroverted evidence, is that he stops right then, takes one swing. Stops. Never connects with anything. Defendant pulls a gun. Puts it point blank to the victim's head and pulls the trigger. Right between the eyes. [¶] But that's not enough, right? Because as he turns around, the defendant turns the gun again and fires a second shot into his side, tearing through his aorta. [¶] And with all of that, a 20-year-old dies in the gutter. *Reasonableness? Is that reasonable?* [¶] *Remember, this is our community standard, right? Is he acting like a reasonable person would act*? No." (Italics added.)

"When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 671 (*Williams*).) Here, we conclude that the prosecutor misstated the law by focusing not on whether it was reasonable for defendant to react rashly, from passion and not from judgment, but instead on whether defendant acted reasonably by killing. By misstating the law, the prosecutor committed misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)

The jury was, however, properly instructed with CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense).[23] Thus, the jury was

---

[23] The court instructed the jury: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if, Number One, the defendant was provoked. [¶] Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. [¶] And Number Three, *the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion, rather than from judgment*. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to

76

properly instructed on the reasonableness requirement of heat of passion provocation consistent with *Beltran*. Additionally, the court instructed the jury pursuant to CALCRIM No. 200 that if the jurors believed "that the attorneys' comments on the law conflict with [the court's] instructions, [the jury] must follow [the court's] instructions." "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*Letner and Tobin, supra*, 50 Cal.4th at p. 196.)

As we have noted, the *Beltran* court explained that the *Watson* standard for harmless error (see *Watson, supra*, 46 Cal.2d at pp. 835-836) focuses on what a reasonable jury is *likely* to have done, not on what a reasonable jury *could* do in the absence of the error, and appellate courts may consider, among other things, "whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran, supra*, 56 Cal.4th at p. 956.) Given the evidence before the jury, which we have previously outlined, and the instructions provided by the court, we see no reasonable

_____

reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation, as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. [¶] Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. [¶] *In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment.* [¶] If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on that basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. [¶] If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

77

likelihood that the jury construed or applied the complained-of remarks in an objectionable fashion (*Williams, supra*, 56 Cal.4th at p. 671); nor is there a reasonable likelihood the result would have been different in the absence of those remarks. (*Beltran*, at p. 956.)

### 7. Initial Aggressor, Mutual Combat and Self-Defense

Defendant claims that the prosecutor improperly implied in closing argument that the terms " 'quarrel' " and " 'fight' " were synonymous and that therefore a defendant loses the right to act in self-defense if that defendant starts either a fight or a verbal quarrel. Defendant asserts that, because there was purportedly no evidence that he initiated the physical confrontation, the import of the prosecutor's argument was that he lost his right to self-defense even if he merely initiated a verbal quarrel or confrontation.

As we have noted in our discussion of CALCRIM No. 3471, the prosecutor told the jury: "Not available if you seek a quarrel with the intent to create the necessity for self-defense. And not available to mutual combatants, unless you withdraw. [¶] If you start the fight, if this is mutual combat, you don't get self-defense unless you've satisfied those conditions, which we know didn't happen in this case. [¶] What that leaves us with when we look at the outline of self-defense and how the law works, we're left with the concept that self-defense is 100 percent reactionary, right? You can't contrive it. You can't set up the circumstances that then requires [*sic*] you to use self-defense, you can't start the quarrel. It has to be reactionary. And that was not the case here."

The jury was properly instructed on self-defense, including the initial aggressor/mutual combat instruction that says a "person who engages in mutual combat or who starts a fight, has a right to self-defense" only if that person tries to stop fighting, communicates the desire to stop fighting, and affords the other party the opportunity to stop fighting. (CALCRIM No. 3471.) The court further instructed the jury that "[a] person does not have the right to self-defense if he provokes a *fight or a quarrel* with the intent to create an excuse to use force." (CALCRIM No. 3472, italics added.)

78

Defendant claims that the prosecutor committed misconduct by suggesting the terms " 'fight' " and " 'quarrel' " are synonymous. However, we do not read the prosecutor's argument that way. To the contrary, the prosecutor merely paraphrased CALCRIM Nos. 3471 and 3472 and in doing so did not suggest that fight and quarrel were the same. The prosecutor said that self-defense is not available if a person seeks a quarrel with the intent to create the necessity for self-defense. And then he explained that if a person starts a fight that person is not entitled to self-defense unless he attempts to withdraw by satisfying the conditions set forth in CALCRIM No. 3471.

As we have demonstrated, provoking a quarrel or fight are *two* different acts of conduct. The prosecutor's argument did not confuse the two terms. The prosecutor's comment that self-defense is not available if one "seeks a quarrel with the intent to create the necessity for self-defense" simply focused on one of the two types of conduct that would preclude self-defense when the use of force is contrived by the defendant, quarrel instead of fight. Then the prosecutor discussed the principle that when a person starts a fight or engages in mutual combat, a claim of self-defense is precluded unless the person withdrew from the conflict. Nothing the prosecutor said in this line of argument amounted to misconduct.

### 8. "Yellow Light" Analogy

Defendant claims that the prosecutor committed misconduct in attempting to explain the concepts of deliberation and premeditation by analogizing them to deciding to drive one's car through a yellow traffic light.

The prosecutor stated in his closing argument: "We've all had yellow lights, where you make some decisions, right? You weigh -- you weigh the for and against. You think about things like, how long has this light been yellow? Okay. How much traffic is in the intersection? How much is the traffic in front of me stopped. How much traffic is there on the sides? Is the -- is there a police officer anywhere around? We go through all of those things in our head[s]. We weigh all of those considerations. We

79

look at the for and against and sometimes, it's easy.  If the light just turned yellow, we go.  Sometimes it's been yellow too long, we stop, but we have all been in those situations where it's right on the edge, right?  That yellow light has been yellow just long enough.  And we make three or four significant decisions, significant to our own safety, significant to the safety of those people around us, and we make those decisions in a split second.  [¶]  And a lot of us press the accelerator and go, but we've made those decisions.  And the reality is, that you have premeditated and deliberated.  And like the law tells us, you make that decision quickly.  So we do make those decisions in our everyday lives.  We make decisions where we impact other people that have large consequences to them.  We make them fast and we premeditate and deliberate.  [¶]  So the idea here, and the law tells us that it's not about the amount of time.  One of the things -- some of the things that we're gonna look at, and remember the law tells us we consider all of the circumstances in the weighing of evidence, right?"

There are an increasing number of cases, published and unpublished, discussing whether this particular analogy appropriately illustrates deliberation and premeditation.  (E.g., *People v. Avila* (2009) 46 Cal.4th 680, 715; *Drain v. Woods* (E.D. Mich. 2012) 902 F.Supp.2d 1006, 1036; *People v. McBride* (Colo.Ct.App. 2009) 228 P.3d 216, 224-225.)  Our state's high court, however, has essentially approved this argument.  (*Avila*, at p. 715.)  Like our high court, we conclude that the prosecutor used this example, and the number of observations and determinations that must be made in a brief period of time, "as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' "  (*Ibid.*)  "Premeditation and deliberation do not require an extended period of time, merely an opportunity for reflection."  (*People v. Cook* (2006) 39 Cal.4th 566, 603.)

The prosecutor's remarks were not inconsistent with the trial court's instructions.  The court instructed the jury with CALCRIM No. 521 (First Degree Murder), which instructed in pertinent part:  "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The

80

amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (CALCRIM No. 521.) The prosecutor's use of the yellow light analogy did not constitute misconduct.

### 9. Lesser Included Offenses

Defendant asserts that the prosecutor committed misconduct by stating that the reason the trial court instructed on lesser included offenses was because the court was required to do so. Defendant emphasizes that the prosecutor did not specify that the court was only required to instruct on lesser included offenses if there was substantial evidence supporting the instructions. According to defendant, the prosecutor misstated the law by implying that the court was only instructing on lesser included offenses because it was obligated to do so based on "some legal technicality."

In closing argument, after discussing the elements of first and second degree murder, the prosecutor stated: "Now, the Judge also instructed you on what's called a lesser-included offense. The crime of murder has contained within it another crime. . . . [¶] . . . [¶] . . . The idea of the lesser-included offense is that, if that can occur, if you can take away one element and be left with another separate crime, then the Court has to instruct you on that crime. [¶] Okay. It doesn't mean that the elements of that crime are there. It doesn't mean there's not a murder that was committed. It simply means that it fits that definition. We can take away one element and we're left with another completely contained crime within it. [¶] Okay. So that's what we mean by a lesser-included offense. Okay. *You have to be instructed on it*." (Italics added.) The prosecutor then went on to discuss voluntary manslaughter.

As defendant observes, the court is required to instruct on a lesser included offense " 'whenever evidence that the defendant is guilty only of the lesser offense is "substantial

81

enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 162.)

In essence, the prosecutor here described the definition of lesser included offenses. While he did not completely explain the circumstances under which instructions on lesser included offenses are to be given to the jury for consideration, he was not required to do so. Contrary to defendant's characterization, the prosecutor's remarks were rather neutral; he essentially explained that the fact that the court was instructing on a lesser included offense did not mean that the elements of the greater offense were not present.

We do not agree that the prosecutor's remarks conveyed the message that the court was only instructing on lesser included offenses because it was required to do so based on some legal technicality. His remarks did not constitute misconduct.

## VII. Ineffective Assistance of Counsel

We have already addressed several of defendant's ineffective assistance of counsel claims. Defendant advances additional claims which, he contends, demonstrate that he was denied the effective assistance of counsel at trial. We conclude that defendant has failed to show he received constitutionally ineffective assistance of counsel.

### A. Failure to Object to Evidence of Ammunition/Magazines

The People presented evidence concerning ammunition and magazines recovered pursuant to a search warrant which were of different calibers than the weapon used to murder Sisoukchaleun. Defendant contends that trial counsel should have objected to evidence pertaining to all of the ammunition and magazines, even of the same caliber as the weapon used in the shooting. He asserts the evidence "was cumulative, as the evidence that [defendant] in fact shot Sisoukchaleun was both overwhelming and undisputed."

"When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577 (*Riser*).) However, evidence of ammunition and weapons other than the weapon used in the specific crime is admissible when relevant for other purposes. (*People v. Smith* (2003) 30 Cal.4th 581, 613-614 [relevant to the defendant's state of mind]; *People v. Cox* (2003) 30 Cal.4th 916, 956-957 [guns relevant either as possible murder weapons or as weapons that could have been used to coerce victims into defendant's car or otherwise subdue them in furtherance of the criminal plan to kill them], disapproved on other grounds in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

While it is clear that some of the ammunition of varying calibers and associated magazines were not related to the handgun with which defendant shot Sisoukchaleun, we conclude that it was not error to admit this evidence on this basis. According to the gang expert, the primary activities of the Meadowview Bloods are robbery, burglary, narcotic sales, *weapons possession*, and assaults with deadly weapons, which have led to murders. Defendant's possession of the ammunition and magazines unrelated to the shooting was relevant to his status as a gang member and to the charged gang enhancement. The possession is conduct consistent with a primary activity of the gang and is evidence from which defendant's "intent to promote, further, or assist in any criminal conduct by gang members" could be inferred. (§ 186.22, subd. (b)(1).) Because this evidence was relevant for other purposes, it was not precluded by the rule in *Riser*. Therefore, trial counsel's performance was not deficient because the objection defendant contends counsel failed to make would have been meritless. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.) This claim of ineffective assistance of counsel fails for that reason.

## B. The Gang Expert's Opinion of Defendant's Gang Membership as Based "On the Facts of This Case"

Defendant asserts that the gang expert, expressing his opinion that defendant was a Meadowview Blood based on, among other things, *the facts* of this case, invaded the province of the jury. Therefore, according to defendant, defense counsel was ineffective for failing to object to this testimony.

An expert witness may express an opinion that embraces an ultimate issue to be determined by the trier of fact, provided the expert's opinion is otherwise admissible. (Evid. Code, § 805.) Conversely, an expert may not offer an opinion as to how the case should be decided (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 651 (*Killebrew*), disapproved on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*)), that a defendant had specific knowledge or intent (*Killebrew*, at pp. 657-658), or as to the defendant's guilt (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77).

Contrary to defendant's contention, the expert's testimony concerning defendant's status as a member of the Meadowview Bloods, based on "the facts of this particular case," did not invade the province of the fact finder. "The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.) "[A]n individual's membership in a criminal street gang is a proper subject for expert testimony." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1464.) Additionally, evidence of the charged offenses may be considered by an expert in forming an opinion as to whether a gang is a criminal street gang with a pattern of criminal gang activity consisting of two or more statutorily enumerated offenses. (*Gardeley, supra*, 14 Cal.4th at p. 625.) While it would have been more accurate for the prosecutor to focus the question on the *evidence* in the case, instead

of the *facts* in the case (see *Vang, supra*, 52 Cal.4th at p. 1043, fn. 1), defendant's trial counsel was not ineffective for failing to object. Had the prosecutor been required to rephrase the question, asking for the expert's opinion based on the *evidence* in the case instead of the *facts* in the case, the expert's answer undoubtedly would have been the same. In addition, the expert would have been allowed to specifically reference the evidence to which the question referred. Where the record sheds no light on why counsel did not object, we reject the claim of ineffective assistance of counsel unless trial counsel failed to provide an explanation at the trial court's request, *or unless there could be no satisfactory explanation.* (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*Carrasco, supra*, 59 Cal.4th at p. 985, quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Here, counsel may very well have made a strategic decision to avoid emphasizing the evidence by having the expert itemize it in explaining what evidence supported his opinion or forcing the prosecutor to state another hypothetical question summarizing the facts of this case.

Moreover, even if counsel was constitutionally deficient for failing to object, defendant has not established *Strickland* prejudice. The evidence of defendant's gang membership was overwhelming.

### C. Failure to Object to the Gang Expert's Testimony about the Perpetuation of Gang Membership

The gang expert testified that gang members do not leave the gang unless they are labeled snitches and the gang stops associating with them. Otherwise, there is no mechanism for gang members to leave the gang. Gang activity may drop off, but association with the gang does not end, and there is "not a true stop in them being who they are. It is who they are. That's what they're about."

According to defendant, his trial attorney was ineffective for failing to object to this testimony. Specifically, defendant claims that this testimony lacked any adequate

85

foundation, and invited the jury to conclude, based on factors other than the criminal history evidence, that defendant acted for gang purposes. Defendant maintains that this was improper propensity evidence which violated his right to due process. Defendant also now claims this testimony was speculative and conjectural.

Defendant misreads the record. It was defense counsel that first inquired on this subject. On cross-examination, she asked, "How do you find -- people leave gangs. That does happen. They're drop outs. People walk away from the gang memberships. How do you find that that happens generally or why it would happen?" The testimony about which defendant complains was in response to that question.

We have already noted that where there may be a satisfactory explanation for not objecting, we reject claims of ineffective assistance of counsel. (*Mendoza Tello, supra*, 15 Cal.4th at pp. 266-267.) As the United States Supreme Court has observed, "There are . . . 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' [Citation.] Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." (*Richter, supra*, 562 U.S. at p. 106.)

Here, there are potentially satisfactory explanations for defense counsel not objecting. Defense counsel could have elected not to object to the testimony about which he now complains because it seemed inherently incredible, which could, in turn, cause the jury to consider the gang expert's testimony overall with greater skepticism. Indeed, defense counsel made this argument to the jury. Ridiculing the gang expert, defense counsel said, "And the last contact he could say that [defendant] had with any gang member was ten years ago. Most of the things he said was just ridiculous. [¶] No drop outs unless snitches." Further, counsel could have reasonably concluded that had she objected, the prosecution would ask additional questions to further explain the expert's opinion on this matter, which he ultimately did on redirect anyway. On redirect, the gang

86

expert testified that some people do drop out of gangs after being exposed to positive programs, for example church or project Cease Fire, a program that encouraged youth to stop gang banging by giving them resources.

We conclude that defense counsel's performance was not deficient for the mere failure to object to this line of testimony. And as before, defendant has failed to establish *Strickland* prejudice.

### D. Failure to Object to Prosecutorial Misconduct

Defendant asserts that counsel's failure to object to the alleged instances of prosecutorial misconduct we discussed, *ante*, rose to the level of constitutional ineffectiveness. Because we have concluded that there was either no misconduct or that no prejudicial prosecutorial misconduct occurred related to the cited comments, we conclude that defendant has failed to establish ineffective assistance for failing to object to these comments.

### VIII. Cumulative Error

Defendant contends that the cumulative effect of the alleged errors warrants reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*Bunyard, supra*, 45 Cal.3d at pp. 1236-1237.) While certain errors in the admission of case-specific hearsay warrant reversal of the gang enhancement allegation true finding, we have further reviewed all of defendant's claims and find no cumulative prejudicial error warranting reversal of his substantive convictions or the firearm enhancements. Defendant was not deprived of a fair trial.

### IX. Ten-Year Gang Enhancement Sentence

Defendant contends, and the People agree, that the 10-year sentence imposed pursuant to section 186.22 must be struck pursuant to subdivision (b)(5) of that section. In light of our determination that the gang enhancement allegation true finding must be reversed, this contention has been rendered moot. (See fn. 2, *ante*.)

87

## X.  Section 12022.53, Subdivision (f)

Our review of the record reveals a sentencing error related to two of the firearm enhancements.  The trial court simply stayed imposition of the sentence on the section 12022.5 and 12022.53, subdivision (b), enhancements.  This was error.  The trial court should have *imposed a specific sentence* on each enhancement and *then stayed execution of those sentences* pursuant to section 12022.53, subdivision (f).

Section 12022.53, subdivision (f), provides in pertinent part:  "Only one additional term of imprisonment under this section shall be imposed per person for each crime.  If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment.  An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section."  Our high court has interpreted section 12022.53, subdivision (f), to require trial courts to *impose* a specific sentence on any lesser firearm enhancement *and then stay execution* of that sentence, in the same way a trial court would impose and stay execution of sentence on counts subject to section 654.  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122-1123, 1128-1130.)  This practice preserves the possibility of executing the stayed sentence of a lesser firearm enhancement should a later reversal by an appellate court eliminate the unstayed sentence on the greater enhancement.  (*Id*. at p. 1128.)

At sentencing, the trial court stated, "just for record keeping purposes, I suppose, the 12022.5[, subdivision] (a)[] . . . and 12022.53[, subdivision] (b), the sentence is stayed on that, because it was imposed for the [section 12022.53, subdivision] (d)."  The trial court did not impose sentences and then stay execution thereof.  Although this issue is not raised by the parties, the trial court's failure to impose sentences on these enhancements was unauthorized.  Because this constituted an unauthorized sentence, it may be corrected at any time.  (See *People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13

88

[it is well established that the appellate court can correct a legal error resulting in an unauthorized sentence, including a misapplication of section 654, at any time].)

In *People v. Alford* (2010) 180 Cal.App.4th 1463 (*Alford*), a case involving a similarly unauthorized sentence under section 654, this court concluded that the "futility and expense" of remand militated against sending the case back to the trial court for resentencing where this court could determine the sentence that the trial court, in the exercise of its discretion, "undoubtedly" would have imposed. (*Alford*, at p. 1473.) However, our statutory authority to modify an unauthorized sentence (§ 1260) does not authorize us to substitute our judgment for that of the trial court with respect to discretionary sentencing decisions. (*People v. Lawley* (2002) 27 Cal.4th 102, 172; *People v. Hines* (1997) 15 Cal.4th 997, 1080.) The section 12022.53, subdivision (b), enhancement poses no issue in this regard because the prescribed sentence to be imposed upon such an enhancement is 10 years. However, the section 12022.5, subdivision (a), enhancement provides for imposition of a sentence of three, four, or ten years. On this record, we cannot say what sentence the trial court "undoubtedly" would have imposed on this enhancement before staying execution of that sentence pursuant to section 12022.53, subdivision (f). (See *Alford*, at p. 1473.) Accordingly, we shall remand the matter to the trial court for resentencing so that the court may select a triad option on the section 12022.5, subdivision (a) enhancement and impose sentence on that enhancement as well as the 10-year sentence on the 12022.53, subdivision (b) enhancement, and then stay execution of those sentences pursuant to section 12022.53, subdivision (f) unless the court exercises its discretion to strike the firearm enhancements altogether (see part XI. of the Discussion, *post*).

## XI.  Senate Bill 620

After defendant was convicted but before his case became final, the Governor signed Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), effective January 1, 2018. Following the enactment of Senate Bill 620, sections 12022.5 and 12022.53 have

been amended to include language stating: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§§ 12022.5, subd. (c), 12022.53, subd. (h).) Prior to the enactment of Senate Bill 620, and when defendant was sentenced, courts did not have discretion to strike or dismiss these enhancements. The former language of these sections explicitly provided that the courts "shall not strike" enhancement allegations under those sections. (§§ 12022.5, former subd. (c), 12022.53, former subd. (h).)

We granted defendant's request for supplemental briefing on the impact of Senate Bill 620. In his supplemental opening brief, defendant asserts that his case must be remanded to the trial court to permit the court to exercise its newly authorized discretion to strike the firearm enhancements imposed in this case. Defendant asserts that the amendments to sections 12022.5 and 12022.53 which now grant sentencing courts the discretion to strike or dismiss those firearm enhancements apply retroactively to his case based on legislative intent and under the rule in *In re Estrada* (1965) 63 Cal.2d 740.

The People concede that the amendments to sections 12022.5 and 12022.53 should be afforded retroactive application to nonfinal judgments and that they should apply to this case. However, the People further assert that, because it is clear that the trial court would not have exercised its discretion to strike the firearm enhancements, no purpose would be served by remand, and, accordingly, remand is not appropriate. In making this argument, the People rely on the fact that the trial court denied defendant's motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*), to dismiss a prior strike allegation, as well as the sentencing court's remarks when it denied the motion.

90

We accept the People's concession and apply Senate Bill 620 retroactively. (See *People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.) Accordingly, we proceed to consider the People's argument that remand would serve no purpose.

In asserting that remand would be futile, the People rely on *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 (*Gutierrez*). In *Gutierrez*, the court considered whether it should remand to allow the trial court to decide whether it would dismiss a strike conviction under section 1385 following our high court's decision in *Romero, supra*, 13 Cal.4th 497. The *Gutierrez* court concluded that "no purpose would be served in remanding for reconsideration." (*Gutierrez*, at pp. 1895-1896.) In reaching this conclusion, the *Gutierrez* court noted that the trial court had done the following at sentencing: "indicated that it would not, in any event, have exercised its discretion to lessen the sentence"; stated that imposing the maximum sentence was appropriate; and imposed an upper term sentence on the base term and two discretionary one-year enhancements, which was not required under the three strikes law. (*Gutierrez*, at p. 1896.) We also note that the trial court expressly stated that in declining to strike the discretionary sentences for the one-year enhancements, that " 'there really isn't any good cause' " to do so. Also, the court further stated that the defendant was " 'the kind of individual the law was intended to keep off the street as long as possible.' " (*Ibid*.)

In discussing its reasons for denying the defendant's *Romero* motion, the trial court here said: "[Defendant] has a lengthy criminal history. It stems from . . . when he was not quite 16 years of age as a juvenile. He was sent to the Boy's Ranch approximately at 15 and a half years old for an assault where he struck an adult in the head with a pistol, causing major injuries that required surgery for a fractured eye socket. So a pretty serious offense for a nearly 16-year-old. [¶] Further, he was adjudicated for a second felony of burglary. He's had a number, at least the report of probation details three such probation violations as a juvenile. One including a sustained felony adjudication for purchasing cocaine for sale. [¶] Also, as an adult, when he was

91

approximately 18 years of age, he was convicted whereby he was on a bike, turned, stopped, pointed a sawed-off rifle at a police officer, which necessitated the officer firing a shot at the defendant, which actually struck [defendant] on the right forearm, but [defendant] was convicted of a 12020 for that offense, as well as a 148. [¶] When he was approximately 20 years old is when he was convicted of the attempted robbery, that is now being asked to be stricken for three strikes purposes. [¶] He was committed to state prison for that offense. He was not successful on parole without violations. He was -- one of the violations was a corporal injury to a spouse which was a misdemeanor conviction for 273.5, at least according to the probation report, he threatened his spouse. He said, Why don't you get out of the car? Let me remind you of what I used to do to you, referring to his prior beatings. [¶] When he was nearly 27 years of age, he was convicted of a pandering charge, whereby he used two young girls, 14 and 16-years-old -- [¶] . . . [¶] and coerced them into performing various sex acts with individuals. He was convicted of that offense in 2002, and committed to state prison for that offense for six years. [¶] So his criminal history is significant. It's extensive. And the nature of these convictions involve not only violence, but the pandering is particularly reprehensible, considering it involved young, minor girls." The court also noted that it had received letters "represent[ing] a different side of" defendant which "speak well to the kind of person that he is." Also, in remarking on the letter defendant had written, the court found that defendant acknowledged responsibility and was regretful and that defendant said he was "trying to turn [him]self around."

In *Gutierrez*, there were no other reasons to remand the matter to the trial court other than to consider dismissing the strike allegation. Here, were it not for the fact we must remand this matter with directions to the trial court to select a triad sentence on the section 12022.5 enhancement and then stay execution thereof pursuant to section 12022.53, subdivision (f), we would consider whether the statements the trial court made here at sentencing are comparable to those made by the trial court in *Gutierrez* and make

92

a determination whether no purpose would be served by remanding this matter. However, in light of the fact that remand is required under the circumstances of this case (see part X. of the Discussion, *ante*), and the interests of judicial economy therefore cannot be served by a determination under *Gutierrez*, we need not decide here whether the sentencing court's remarks indicate that remand would serve no purpose.

## DISPOSITION

The judgment of conviction is affirmed. The jury's true finding on the gang enhancement allegation is reversed and the sentence imposed thereon vacated. On remand, the People may elect to retry the gang enhancement allegation. The trial court will resentence defendant, where it is further directed to (1) consider whether to exercise its discretion to strike the section 12022.5, subdivision (a) and 12022.53, subdivision (b) firearm enhancements, and, in the event that the court declines to exercise its discretion to strike them (2) impose sentences on these enhancements and then stay execution of those sentences pursuant to section 12022.53, subdivision (f). The trial court is directed thereafter to prepare an amended abstract of judgment reflecting these modifications and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

/s/ _____
MURRAY, J.

I concur:

/s/ _____
MAURO, J.

93

BLEASE, Acting P. J., Concurring and Dissenting.

In our original opinion in this case, I dissented from the majority's conclusion that the Confrontation Clause contention was forfeited. (*People v. Blessett* (2018) 22 Cal.App.5th 903, 957 (Blease, J., dissenting).) Addressing the confrontation claim on the merits, I found the admission of case-specific testimonial hearsay through the gang expert's testimony violated defendant's right to confrontation, and, with respect to the murder conviction, prejudicial under the harmless beyond a reasonable doubt standard. (See *id.* at pp. 966-969.) In particular, I found the case-specific hearsay " 'supported the prosecution's position that defendant was an active member of the Meadowview Bloods, that, when he shot Sisoukchaleun, he did so for the benefit of that particular criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members within the meaning of [Penal Code] section 186.22.' [Citation.]" (*Id.* at p. 968.) While there was substantial evidence in addition to the improper gang evidence supporting the prosecution's theory of a gang-motivated shooting, "the record did not foreclose a finding that Sisoukchaleun was the aggressor, and that defendant was acting in self-defense when he shot him." (*Ibid.*) I noted, for example, Thammavongsa's testimony that "the other guys in their group were '[r]ight there with us, and Thammavongsa confirmed that he would have gotten involved if defendant had gotten the better of Sisoukchaleun in the fight. Sisoukchaleun was saying, 'Let's fight,' but defendant 'didn't really say nothing' and did not square up to fight. Sisoukchaleun took a swing at defendant, and defendant dodged out of the way, pulled out a gun, shot Sisoukchaleun in the face and chest, and fled." (*Ibid.*) As to the video evidence, "[w]hile defendant may have chosen to re-engage Sisoukchaleun and his friends after retrieving his gun, it is also possible that he simply returned to pick up his alcohol and Sisoukchaleun and his friends re-engaged defendant. It is not clear. For that reason, I disagree with the majority's conclusion that the video evidence negates any

1

claim of self-defense or imperfect self-defense." (*Id*. at p. 969.) Since the Confrontation Clause error was not harmless beyond a reasonable doubt, I would have reversed the murder conviction and the true findings on the gun and firearm enlacements. (*Ibid*.)

On remand, the majority and I are now in agreement regarding the lack of forfeiture, and that the case-specific hearsay in the gang expert's testimony violated defendant's right to confrontation. While I also agree with the majority that the error was prejudicial with respect to the gang enhancement, and harmless beyond a reasonable doubt as to the felon in possession of a firearm conviction, for the reasons stated herein and in my prior dissent, I respectfully disagree with the majority's conclusion that the error was harmless beyond a reasonable doubt as to the murder conviction and firearm enhancements.


/s/                    
BLEASE, Acting P. J.

Filed 5/25/22

Court of Appeal, Third Appellate District - No. C074267

**S273349**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

ANTOINE LAMAR BLESSETT, Defendant and Appellant.

_____

The petition for review is denied.

Liu and Groban, JJ., are of the opinion the petition should be granted.

See Dissenting Statement by Groban, J.

_____Cantil-Sakauye_____
*Chief Justice*

PEOPLE v. BLESSETT

S273349


Dissenting Statement by Justice Groban


In this case, defendant Antoine Blessett was convicted of first degree murder after shooting the victim Christopher Sisoukchaleun in a gang-related altercation.  All parties agree that the jury improperly heard extensive accounts of seven prior offenses involving Blessett, as well as the details of three predicate offenses committed by other gang members.  Many of these details were upsetting and violent, including a description of Blessett pulling a gun on a police officer and ultimately being shot by the officer; Blessett being shot a second time in a different gang altercation; and Blessett committing a number of violent felonies, including an attempted carjacking of a father while he was loading his child into the automobile.  There is no dispute that all of this evidence was improperly before the jury.  But the majority below concluded the introduction of this evidence was harmless beyond a reasonable doubt as to Blessett's murder conviction.  Because there are significant questions as to whether the introduction of this evidence was harmless, I would grant review.  The central issue in this case was whether Blessett was acting in perfect or imperfect self-defense.  The People used these prior crimes to full effect, arguing to the jury that "when we talk about the defendant and his ties to that street gang, it illuminates for us a little bit about what his intent was" and "show[s] a little bit of his motive in committing the crime that he committed."  The issue of self-defense was close:  indeed, Sisoukchaleun's own cousin testified

1

that Blessett and Sisoukchaleun exchanged gang slogans; it was "basically" six on one against Blessett; Sisoukchaleun's companions were "[r]ight there with us"; Sisoukchaleun challenged Blessett to fight; Blessett "didn't really say nothing" and "wasn't squaring up"; and then Sisoukchaleun took the first swing before Blessett shot Sisoukchaleun. In this context, there is significant reason to doubt whether the erroneous admission of a trove of prior violent acts involving Blessett was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).) The stakes for Blessett are monumental — he is currently serving 50 years to life on the murder conviction. I would grant review to consider this issue and thereby provide additional guidance to our lower courts on how to apply the *Chapman* standard for review of constitutional error.

## I. BACKGROUND

This case returns to us after we decided both *People v. Perez* (2020) 9 Cal.5th 1 (*Perez*) and *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*).

Blessett argued unsuccessfully at his murder trial that he shot the victim in self-defense or imperfect self-defense. After his trial, we announced the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.) Furthermore, "[i]f the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Ibid.*) The Court of Appeal

here subsequently affirmed, finding, among other things, that Blessett's claims under *Sanchez* were forfeited, that a gang expert's testimony about the underlying facts of predicate offenses was general background information and not hearsay, and that even assuming counsel had objected, any error was harmless beyond a reasonable doubt under *Chapman*. Justice Blease dissented. We granted review and held the case pending disposition of *Perez* and then held the case pending disposition of *Valencia*. In *Perez*, we held that failure of defense counsel to object to an expert's testimony on hearsay grounds before *Sanchez* was decided did not forfeit a claim on appeal based on *Sanchez*. (*Perez, supra,* 9 Cal.5th at p. 4.) In *Valencia*, we held (again departing from the Court of Appeal here) that predicate offenses are case-specific under *Sanchez* and must be proven by competent evidence. (*Valencia, supra,* 11 Cal.5th at p. 838.) In both *Perez* and *Valencia*, we expressly disapproved the Court of Appeal's original majority opinion. (*Perez,* at p. 14; *Valencia*, at p. 839, fn. 17.) We transferred this case back to the Court of Appeal.

Upon the case's return, the Court of Appeal reversed the gang enhancement but otherwise affirmed. Despite acknowledging the extensive amount of prejudicial gang evidence that was impermissibly admitted at trial under *Sanchez*, the Court of Appeal majority again found the error harmless beyond a reasonable doubt as to Blessett's murder conviction. For a second time, Justice Blease dissented, arguing that the errors required reversal of the murder conviction. Blessett petitioned for review.

## II. DISCUSSION

The parties and the Court of Appeal agree that the standard of reviewing the gang expert testimony admitted in

violation of *Sanchez* and the Sixth Amendment right to confrontation is that under *Chapman*. Under that standard, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman, supra*, 386 U.S. at p. 24; see *Satterwhite v. Texas* (1988) 486 U.S. 249, 258–259 ["The question . . . is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained' "].)

Blessett argues that the majority below erred in finding that the admission of gang expert testimony, admitted in violation of the Sixth Amendment right to confront witnesses, was harmless beyond a reasonable doubt under *Chapman* as to the murder conviction. Blessett's contentions have considerable force. First, this was not a "cut-and-dry" case for the prosecution. Blessett was 36 years old at the time of the encounter. The evidence indicated that his last gang-related activity had been in April 2002, nearly 10 years before the shooting. The video of the incident — a key piece of evidence in the case — is of nominal utility: it is of fairly poor quality, has no sound and, most notably, the actual shooting occurs off camera. The majority below interprets the video as unhelpful to Blessett, noting, among other things, that Blessett retrieved a gun from his truck and "chose to re-engage the group" and that Blessett was not "surrounded" because "the video shows that defendant followed [the victim's] group into the recessed area." The majority below further points to the fact Blessett appeared to ignore the attempts of a third person to de-escalate the situation and that Blessett, rather than disengaging from the

confrontation, appears to be walking *toward* Sisoukchaleun as they move off camera. These points certainly buttress the contention that Blessett was: (1) not acting solely in self-defense and that (2) pursuant to CALCRIM No. 3471, the fight constituted "mutual combat" because it "began or continued by mutual consent or agreement" and Blessett cannot demonstrate, as he must, that he "in good faith tried to stop fighting." However, there are several facts evident in the video that are not in dispute and which clearly support Blessett's theory of perfect or imperfect self-defense:

- Blessett walked up to the entry area of the liquor store entrance alone and then waits there.
- A minute and a half later, a group of six men walk up to the liquor store entrance from different directions. Blessett is clearly outnumbered.
- After Blessett returns from the truck, a person in the group gestures with his right hand toward Blessett, and Blessett twice brings his hands down in a downward motion.
- Sisoukchaleun takes his outer shirt off and hands it to his companion (the obvious inference being that he was preparing to fight Blessett).
- Blessett turns around and walks a few feet away with his back to the group. Sisoukchaleun follows and then the group does as well.
- Within a few seconds, Sisoukchaleun walks off camera, one member of the group puts his hands on Blessett, Blessett points to him and then walks off camera as well,

and then several others from the group walk off camera (the shooting soon takes place off camera).

In this way, though the video is clearly subject to competing interpretations, it is hard to view it as conclusive, especially since the actual shooting occurs outside of view.

Moreover, as the majority acknowledged, the jury heard additional testimony that was helpful to Blessett. Weena Vue, who had met Sisoukchaleun earlier in the night at a casino and accompanied him to the liquor store, testified that when initially walking up to the liquor store, Sisoukchaleun uttered the term "cuz." A gang expert testified that "[c]rips use the term 'cuz' in personal identification of another." Vue further testified that Blessett then invoked the gang term "Meadowview Bloods," and Sisoukchaleun invoked the gang term "LAC, Little Asian Crip." Sisoukchaleun's cousin Jack Thammavongsa similarly testified that, when walking up, both he and Sisoukchaleun were saying "cuz" and that Sisoukchaleun threw his hands up. After Blessett said, "Meadowview Bloods," Sisoukchaleun responded, "This is LGC." Blessett obtained the gun from the truck after Sisoukchaleun had announced his gang affiliation. A forensic pathologist testified Sisoukchaleun's blood alcohol level was 0.28 percent. Blessett argues that, outnumbered and afraid, and already having been challenged and confronted by a rival gang member, he retrieved the gun for protection (notably, it appears that Blessett was still waiting for his order to be prepared by the liquor store, which eventually appears at the foot of the entrance and is retrieved by his female companion after the shooting).

The testimony of Sisoukchaleun's own cousin and fellow gang member also provided unexpected support to Blessett's self-defense claim at trial and explained the moments off camera

6

when the shooting occurred.[1]  Thammavongsa testified that Sisoukchaleun "got tired of hearing" Blessett say, " 'Blood, Meadowview,' this and that," so "he took his shirt off, walked out to the street."  Thammavongsa followed him into the street off camera.    The group was "[r]ight there with us."  Sisoukchaleun was saying, "What's up?  Let's fight.  Let's fight," but Blessett "didn't really say nothing" and "wasn't squaring up" to fight.  Thammavongsa admitted he was a Lao Gangster Crip and that he would have intervened if Sisoukchaleun was getting beaten up.    Thammavongsa acknowledged that it was "basically" six on one but later clarified that the others in the group "didn't really know what was going on."  Sisoukchaleun took a swing at Blessett.  Blessett "dodged it and pulled a gun out."  Blessett shot Sisoukchaleun in the chest and fired "two or three times."  This testimony — again from the victim's own cousin and fellow gang member — is highly supportive of the defense theory that Blessett was not engaged in mutual combat and that he ultimately acted out of his fear of his own safety: the victim (who was very intoxicated) exchanged gang challenges with the defendant; the victim then took his shirt off and challenged the defendant to a fight while the defendant was silent and not "squaring up" to fight; the victim's cousin followed the two men and was prepared to back up the victim; the victim's four other male companions were "right there with us" while the defendant was alone (save for his sole female companion); and

---

[1]     Thammavongsa's testimony was in contrast with the prosecutor's initial theory in opening statements "that with no warning whatsoever, the defendant just pulled that gun out of his right rear pocket, put it to the victim's head, and shot him at almost point blank range, right between the eyes."

the victim took the first swing at the defendant, which the defendant dodged and then pulled out a gun and shot the victim.

Against this backdrop of a less than an overwhelming case for first degree murder, the Attorney General concedes that extensive gang evidence was improperly admitted under our three related decisions in *Sanchez, Valencia,* and *Perez.* The majority below summarized the improper evidence involving Blessett as follows: "the November 1991 incident when defendant was shot in the back allegedly in relation to a rivalry between the Oak Park Bloods and the Meadowview Bloods; the December 1992 incident where defendant was arrested for a felony warrant and admitted possession of rock cocaine found at the location; the June 1993 incident when he was in a car with another when a firearm was found in the car; an incident in October 1993 when, while running from the police, he displayed a firearm and was shot by the officer; the January 1995 police contact involving a domestic violence call; his commission of armed robbery in September 1995; and his commission of unspecified gang crimes in April 2002 with a Del Paso Heights Blood."

Thus, the gang expert improperly testified to Blessett's participation in seven prior incidents, many of them very violent and with gang overtones. Testimony about the October 1993 incident where Blessett pulled a loaded rifle on a police officer was particularly prejudicial. Specifically, the gang expert testified that a "Sacramento [Police Department] officer was working patrol. He observed an individual riding a bicycle. He attempted to stop that individual, ended up later being identified as Mr. Blessett. The individual on the bicycle attempted to flee, and subsequently got off the bicycle, tried to take off running as the officer was giving chase to him. As

[Blessett] was pulling the rifle out, the officer, fearing for his life, shot at Mr. Blessett, striking him at the time, and he was subsequently taken into custody at that location." Testimony about Blessett's October 1992 commission of an armed robbery and a September 1995 attempted carjacking was also highly prejudicial. For the October 1992 armed robbery, the gang expert testified that an "individual by the last name of Walters was approached by two male Blacks. One of them produced a firearm, pointed it at the victim and said, 'Break yourself.' Mr. Blessett was later identified as the individual with the gun." For the September 1995 attempted carjacking, the gang expert testified that while the victim was loading his daughter into his vehicle, "he observed two male Blacks [one of whom was later identified as Blessett] wearing ski masks. And one of the individuals pointed a handgun at him and told — demanded victim's wallet and keys at the time. Victim took off running, at which time the occupants of the vehicle wearing ski masks also fled." This evidence, which all parties concede was improperly before the jury, painted a very damaging image of a defendant claiming self-defense. The jury heard detailed accounts of Blessett's involvement in no less than seven improperly admitted felonies, dating back over two decades. Some of the details are both disturbing and violent, including: Blessett being shot in a gang confrontation; Blessett being shot a second time, this time by police after pulling a rifle on an officer; Blessett committing armed robbery;[2] and Blessett committing

---

[2]     The jury heard additional testimony about Blessett robbing a woman, but this testimony was later stricken for an unspecified reason.

an attempted armed carjacking of a father who was with his young child.

The majority further found that the gang expert improperly testified to the details of three predicate offenses committed by three other fellow gang members — including testimony about active participation in a street gang, battery, first degree burglary, and assault by means likely to cause great bodily injury. While not directly involving Blessett, this testimony went into great detail on a particularly violent incident involving the Meadowview Bloods gang and was damaging to Blessett's defense as well. The gang expert gave extensive testimony regarding three Meadowview Bloods members making an unprovoked attack on a victim standing in his front yard and then assaulting the victim's two sons who had come to their father's aid. The officer described to the jury that the three men then obtained a gun from their vehicle and attempted to gain entry to the house.

The prosecutor's closing arguments and the jury instructions further compounded the prejudice from the improper testimony. The prosecutor argued in closing argument that "when we talk about the defendant and his ties to that street gang, it illuminates for us a little bit about what his intent was and why, really why he would do what he does to benefit the gang. [¶] Okay. So, we use that to some extent to help show that mentality, to help show why it is that he would be looking to benefit that gang. And also, to show a little bit of his motive in committing the crime that he committed." The jury was then instructed to consider the "evidence of gang activity" to decide motive and intent and "to evaluate the credibility or believability of a witness." Thus, consistent with the prosecutor's arguments, the jury was instructed to consider the

improper gang evidence for intent, as well as to evaluate the credibility of witnesses in a case that turned on whether Blessett had the intent necessary for first degree murder.  Indeed, there was no dispute that Blessett shot and killed Sisoukchaleun.  Rather, defense counsel argued at trial that Blessett acted in perfect or imperfect self-defense.  The fact that Blessett argued in the alternative is crucial here.  The issue of *Chapman* error does not turn solely on whether Blessett might have been *acquitted* under a perfect self-defense theory.  Instead, the relevant inquiry also must address whether the improperly admitted evidence prejudiced his theory of imperfect self-defense, whereby even if the jury were to find that Blessett's belief in the need to use deadly force was unreasonable, the jury could nonetheless return a verdict of voluntary manslaughter instead of first degree murder (assuming they found Blessett actually believed that he was in imminent danger of great bodily injury, and the immediate use of deadly force was necessary to defend against the danger).  (See CALCRIM No. 571.)  As the Supreme Court said in *Chapman*: "[T]hough the case in which this occurred presented a reasonably strong 'circumstantial web of evidence' . . . , it was also a case in which, absent the constitutionally forbidden [evidence], honest, fair-minded jurors might very well have brought in not-guilty verdicts [or verdicts on lesser charges].  Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that the [improper evidence] did not contribute to petitioners' convictions."  (*Chapman, supra,*

386 U.S. at pp. 25–26, citation omitted.)[3] In short, in a case in which Blessett put on a robust defense supporting a theory of at least imperfect self-defense (including helpful testimony from the victim's own relative), I find it difficult to conclude "that the State has demonstrated, beyond a reasonable doubt, that" the improper inclusion of evidence concerning seven prior felonies, many of them violent, as well as the details of three violent predicate offenses, did not contribute to Blessett's conviction for first degree murder. (*Id.* at p. 26.)

A grant of review here could not only remedy a potentially erroneous conviction, but would also allow this court to provide further guidance on the application of harmless error review. The decision below shows that the application of harmless error review may well have been applied in a way that *Chapman* does not support. For example, the majority below concludes, in part, that admission of the gang evidence is harmless beyond a reasonable doubt because there was evidence that Blessett killed, not in self-defense, but "because of gang-related animus." While Sisoukchaleun and Blessett initially exchanged gang terms (and that evidence was admissible), seven prior offenses implicating Blessett were improperly admitted to support the idea that Blessett killed "because of gang-related animus." As

---

[3]     As the majority below highlighted, there was properly admitted evidence supporting the prosecution's theory of a gang-motivated shooting, including: Blessett's "Meadowview" tattoo; his jail phone conversations in which he indicated he was a "blood" and that he had previously been shot in a gang shooting; his attempt to conceal evidence after the incident; his statements to police, in which he stated that he was not the shooter; and evidence that he shot Sisoukchaleun in the face in close range, as well as a second shot in the torso.

described above, the prosecutor expressly argued that this improperly admitted evidence "show[s] a little bit of his motive in committing the crime that he committed." Thus, the evidence that the Court of Appeal concedes was improperly admitted helped support the very theory that the Court of Appeal concludes makes his conviction harmless. This cannot be. Blessett rightfully suggests that we grant review to clarify that appellate courts must not overlook evidence and alternate inferences favoring the defense position in conducting harmless error analysis under *Chapman*. Indeed, *Chapman* requires that we look "to the 'whole record' " rather than simply concluding the People's alternate inferences from the evidence seem more plausible than the defendant's. (*People v. Aranda* (2012) 55 Cal.4th 342, 367 ["When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required"].)

In sum, this is a case where a jury heard a detailed description of a string of violent gang-related acts committed by Blessett and his fellow gang members. The People in closing argument, and the jury instructions themselves, instructed the jury that they could use this evidence to determine his intent and motive in committing the charged crime. But there is no dispute that the jury should not have heard this evidence. And the jury considered it in the context of a less than overwhelming case for the prosecution: Blessett was approached at the liquor store by six men who immediately began exchanging gang slogans; the victim "got tired of hearing" Blessett's gang slogan, took off his shirt, and challenged Blessett to fight; Blessett "didn't really say nothing" and "wasn't squaring up"; and then, with his companions "[r]ight there with us," the victim took the first swing at Blessett, who responded by shooting the victim.

In this context, there are genuine questions about whether Blessett's conviction, which virtually ensures that he will spend the rest of his life in prison, is valid.[4]  I would grant review.

**GROBAN, J.**

**I Concur:**

**LIU, J.**

---

[4]    See Penal Code section 1473, subdivision (b)(3)(A) (a writ of habeas corpus may be prosecuted for, inter alia, new evidence "that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial").